Argued and submitted June 13, accused suspended for 35 days November 30, 1989,
reconsideration denied January 11, 1990

In re Complaint as to the Conduct of

# DAVID H. LEONARD,
*Accused.*

(OSB 86-122; SC S35944)

784 P2d 95

Thomas C. Howser, Ashland, argued the cause for accused. Douglas M. Engle of Howser & Munsell, Ashland, filed the briefs.

Martha M. Hicks, Lake Oswego, argued the cause and filed the response brief for the Oregon State Bar.

L. E. Ashcroft, Salem, filed a brief *amicus curiae.*

PER CURIAM

## PER CURIAM

The accused is a lawyer charged with two instances of dishonesty under *former* DR 1-102(A)(4) (now renumbered DR 1-102(A)(3)) of the Code of Professional Responsibility), which provides:

> "It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

A Trial Panel found the accused guilty of both charges, and imposed a public reprimand. Both the Oregon State Bar (the Bar) and the accused sought review in this court. We find the accused guilty on one of the charges only, but we impose a suspension from the practice of law for 35 days.

## I. UNDISPUTED FACTS[1]

The accused is a member of the Oregon State Bar. He has his principal office and place of business in Salem.

During the period in question, the accused was the lawyer for Chemeketa Investors, Ltd., a limited partnership, and for Chemeketa Investment Fund, Inc., an Oregon corporation which was the general partner in Chemeketa Investors. In addition to serving as its lawyer, the accused owned a substantial portion of the stock in Chemeketa Investment Fund.

Chemeketa Investors owned an office building known as the "Marion Building" at 235 Union Street, N.E., in Salem. The accused was also a shareholder in his law firm, which was the primary tenant of the Marion Building.

Between October, 1982, and February, 1983, the accused, on behalf of Chemeketa Investors, Ltd., entered into negotiations for a sale of the Marion Building in exchange for, among other things, cash and another building. Other parties to these negotiations included Zeeb's Investment Company, which was trying to set up the exchange, and Thurlowe and

---

[1] The statement of facts is drawn substantially from the opinion of the Trial Panel.

Joyce Gingerich, who were the owners of a commercial building located on Silverton Road in Salem. The Gingeriches were represented by Salem lawyer Kenneth Sherman.[2]

In general outline, the arrangements called for Chemeketa Investors to transfer its equity in the Marion Building in exchange for relief from mortgage debt on the Marion Building, cash and other consideration. The Gingeriches were to transfer their equity in the Silverton Road property to Chemeketa Investors and receive in exchange the equity in the Marion Building, a leaseback of the Marion Building from Chemeketa Investors, and other consideration. It is on the rock of the terms of the leaseback that this ship foundered.

After conferring with Mr. Gingerich and Rod Zeeb, who represented Zeeb's in the pertinent portion of the transaction, Sherman drafted a proposed lease of the Marion Building to Chemeketa Investors. The lease, which listed the Gingeriches as landlord and Chemeketa Investors as tenant, provided for a 10-year term with a monthly rent of $8,850. The rent was to be adjusted upward, if appropriate, at the end of three, six and nine years, based on the Portland, Oregon, Consumer Price Index (CPI).

The accused objected to the CPI approach. He wanted the rent to be recalculated at the end of each period on the basis of the then-prevailing "market rent" — *i.e.,* the rent at which the premises would rent in a free market at a particular time — even if that figure fell below the initial floor of $8,850 per month. He interlineated the Sherman draft accordingly. The Gingeriches rejected this modification.

There followed a month of negotiations between the accused, the Gingeriches, Zeeb's and Sherman over various aspects of the property exchange. The exchange was modified in other respects. However, the accused was aware that the Gingeriches remained unwilling ever to let the Marion Building rent drop below the initial $8,850 figure.

Sherman redrafted the lease. Although the new version accommodated the accused's wishes in other respects, it

---

[2] There was one other party whose properties were a significant part of the exchange, but neither he nor his properties play a role in the facts surrounding the alleged misconduct by the accused.

continued to provide that in no event could the rent be reduced below $8,850 per month. The lease was placed in escrow awaiting the signatures of the parties.

On January 24, 1983, the Gingeriches signed the lease that Sherman had prepared. Two days later, the accused met with Sherman at Sherman's office to discuss the lease and, more specifically, the rent provision. It is from this point on that there are substantial differences in the testimony of the various participants in these events.

## II. DISPUTED FACTS

The accused testified that Gingerich was at Sherman's office for the meeting. Gingerich does not recall ever being at such a meeting; Sherman testified unequivocally that Gingerich was not there. Sherman testified that he told the accused that his clients would never agree to let the rent go below $8,850. The accused testified that, after some discussion, Gingerich agreed to have the lease modified to permit the rental figure to move up or down.

In any event, very soon thereafter the accused went to the escrow office and modified by interlineation the rent provision in the new draft that Sherman had prepared. The change modified a provision stating "which rent shall not be lower than the initial rent provided under the lease" by crossing out the word "shall" and substituting the words "may or may not," thus changing the provision to read "which rent may or may not be lower than the initial rent provided under the lease." As thus modified, the provision allowed the rent to fall below $8,850 per month. The accused initialed the change and signed the lease. The accused did not inform Sherman that he had made the change.

The Zeebs became aware of the modification by interlineation when a representative of the escrow company called Rod Zeeb about it. Rod Zeeb testified that he then telephoned the accused to determine the purpose of the interlineation. He further testified that the accused said that the interlineation merely served to conform the paragraph in which it appeared with language in a separate paragraph that dealt with rent adjustment using the CPI. There was therefore no need, the

accused told Zeeb, for the Gingeriches to consult with Sherman before initialing the change. Zeeb relayed this information to the Gingeriches, who initialed the lease without consulting Sherman.

For his part, the accused testified that he did not have a telephone conference with Rod Zeeb concerning the interlineation.

Three years passed. By letter dated October 30, 1985, the accused wrote to the Gingeriches on behalf of Chemeketa Investment Fund. He advised the Gingeriches that the law firm had employed an appraiser to determine the appropriate rent for the next three-year term by reference to the local market. The accused proposed to reduce the rent to $4,187.60 per month, commencing December 1, 1985.

The demand by the accused brought the Gingeriches back to Sherman, who learned for the first time that his clients had initialed the change to the lease. An action was filed. The case was brought to the attention of the Bar.

### III. BAR'S CAUSES OF COMPLAINT

The Bar initiated the present proceeding against the accused, charging that the foregoing facts constituted two separate acts of conduct involving dishonesty, fraud, deceit or misrepresentation — the first in unilaterally modifying the lease agreement when the accused knew such modification to be contrary to the intent of the Gingeriches; the second in misrepresenting to Rod Zeeb the material nature of the change in order to procure the Gingeriches' signatures on the document without their consulting with Sherman.

### TRIAL PANEL DECISION; REVIEW BY THIS COURT

After a hearing, the Trial Panel found the accused guilty on both the Bar's Causes of Complaint. Both sides appealed to this court. We shall deal with the Causes of Complaint in their numerical (and chronological) order.

*1. First Cause of Complaint —*
*The Act of Interlineating the Lease*

Concerning the First Cause of Complaint, the accused argues that the changes he made in the lease were made only after the Gingeriches had agreed to them. As

already noted, the accused testified that Thurlowe Gingerich was at the meeting that the accused attended at Sherman's office on January 26, 1983, and that both Sherman and Gingerich agreed to the changes later made in the lease. Sherman testified that Gingerich was not present and that he, Sherman, would never have agreed to the interlineated changes later made by the accused. This again is the sort of factual disagreement best resolved by those who saw and heard the witnesses — the Trial Panel. That body believed Sherman and Gingerich; it disbelieved the accused.

We, too, are satisfied that the meeting went as Sherman testified. There are several reasons for this. First, Sherman's testimony could not be clearer or more certain. Second, the supposed agreement to amend the lease by interlineation, rather than by having it redrafted, would have run afoul of one of Sherman's characteristics — he hates interlineation. (The Gingeriches even groused a little in their testimony about Sherman's compulsiveness on this point.) Had the deal been made as the accused testified, we have no doubt that Sherman would have insisted that the lease be returned to him for one last redrafting.

Accepting the Sherman/Gingerich version of the facts does not end the inquiry, however. Whether the act of interlineation violated the disciplinary rules depends on the accused's state of mind at the time.

At least three states of mind were possible, only one of which would implicate the disciplinary rules. The first possibility is that there could have been an innocent misunderstanding — *i.e.,* the interlineation was actually believed by the accused to represent what he and Sherman had agreed to. We reject it. As already indicated, we accept the Sherman/Gingerich version of the January 26, 1983, meeting. It is difficult to see how the accused could have emerged from that meeting under the impression that Sherman had acceded to the demand to remove the floor from the rent provision.

The second possibility is that the accused intended to mislead the Gingeriches into entering into a lease on terms they did not accept. We find this possibility almost equally unlikely. In order for us to believe that, at the time of the interlineation, the accused already intended to deceive the Gingeriches, we would have to assume that the accused (1)

knew that Rod Zeeb, not Sherman, would be notified of the change; (2) knew that Rod Zeeb would call the accused, but not Sherman, to ask why the change had been made; (3) believed that Zeeb would ask the accused if Sherman should be consulted; (4) believed that Zeeb would accept the accused's assurances that Sherman need not be consulted; (5) believed that Zeeb would consult with the Gingeriches; (6) believed that, if the issue of consulting with Sherman came up, Zeeb would talk the Gingeriches out of it; and (7) believed that the Gingeriches would not on their own consult with Sherman in any event. Those are too many assumptions for us to make concerning the accused. Only an evildoer in an Agatha Christie whodunit has that kind of prescience.

■ The third possibility is that the accused believed the interlineation represented a rejection of the lease agreement prepared by Sherman for the Gingeriches, and a counterproposal which the Gingeriches were free either to accept or reject. We believe this to be by far the most likely possibility. We are not persuaded that the accused, at the time he made the interlineation, intended to deceive anyone. Indeed, it may only have been the chance occurrence of the later call from Rod Zeeb that caused the accused to change course from attempting to get the deal he wanted through a counteroffer to attempting to get it through misrepresentation. At any rate, we are not persuaded that the accused intended to misrepresent anything by the act of interlineation.

We find the accused not guilty on the Bar's First Cause of Complaint.

### 2. Second Cause of Complaint — Telephone Conversation with Rod Zeeb

■ The accused responds to the Second Cause of Complaint, concerning the accused's telling Rod Zeeb that there was no need for the Gingeriches to consult with Sherman because the interlineations were consistent with the deal the parties had made, by denying that the conversation took place. Like the Trial Panel, we conclude otherwise, although for different reasons.

The Trial Panel found that Rod Zeeb's recollection of events was more reliable than that of the accused. The Trial Panel claimed that its reliability assessment was bolstered by

the fact that the accused's own telephone records appear to refer to this conversation. It explained in its "Opinion and Disposition":

> "8. In fact, a review of the Accused's billing records received in evidence as Exhibit 106 reflects a telephone conference with Clay and Rod Zeeb on January 27, 1983. Rod Zeeb testified he had called the Accused after the Accused had signed and interlineated the lease * * *."

We have examined the exhibit on which the trial panel relied. The pertinent entry states in full:

> "1/27/83   TELEPHONE CONFERENCE C/ C. CURRY RE SIGNATURES; PC FROM LINDA R. RE APPRAISAL AND RENT; PC TO CLAY & ROD"

This entry refers to three different events, each set off from the others by semicolons. The last event — "PC TO CLAY & ROD" — is the one relied on by the Trial Panel. This entry varies from Rod Zeeb's testimony in two important respects. Rod Zeeb testified that he placed the call to the accused; the entry refers to a phone call (the "PC") placed by the accused. Rod Zeeb testified that he had the conversation with the accused; the entry reflects a conversation between the accused and both Rod and Clay Zeeb.

Other circumstances, however, corroborate that testimony. Rod Zeeb testified that, on learning of the interlineation, he contacted the accused and the accused assured him that the change was "no big deal." Zeeb further testified that he then met with the Gingeriches and told them that it would be all right to initial the change on the lease without checking with Sherman, because the accused had said the change was not significant. Counsel for the accused has argued that Zeeb's recollection of any conversation with the accused must be examined carefully because Zeeb would be motivated to justify his advice to the Gingeriches to initial the lease, now that it turns out that the result is not what the Gingeriches wanted. But Zeeb's testimony in this proceeding is entirely consistent with the Gingeriches' testimony about what Zeeb told them at the time. We find this consistency corroborates Zeeb's testimony.

The accused argues that the Gingeriches (or at least Thurlowe Gingerich, who makes the financial decisions for

the family) read the interlineation and were perfectly capable of understanding what they were signing. The accused reasons in essence that the Gingeriches, who apparently own property valued in millions of dollars (property which they obtained, in some instances, in tax-free trades like the one involved in this case), are not exactly folks who just fell off the turnip truck when it comes to real estate transactions. That is an easily overstated proposition. It is true that Thurlowe Gingerich seems to have a firm — one might even say "fierce" — grasp of the cash flows that result from the deals in which he is involved. But it is also very clear from his own testimony, as well as that of Sherman and Zeeb, that he relies completely on professionals whom he trusts to design the instruments that will achieve his financial goals for him.

Equally important in our acceptance of the testimony of Rod Zeeb and the Gingeriches is the fact that each had a special reason to believe the accused. The accused had once been a lawyer for the Gingeriches; they appear to have regarded him with a high degree of respect and trust. The accused also had a special relationship with Rod Zeeb. He had befriended Zeeb when both worked in the same building; he had been a principal inspiration for Zeeb's subsequent decision to go to law school. These circumstances make what otherwise might seem a degree of naivete' on the part of Zeeb and the Gingeriches more understandable.

We find by clear and convincing evidence that the accused misrepresented the importance of the interlineation, intending to keep the Gingeriches from fully understanding the bargain they were making. This was a "misrepresentation" under *former* DR 1-102(A)(4). The accused is guilty of the Bar's Second Cause of Complaint.

### 3. The Accused Violated the Disciplinary Rule

■ ■ The term "dishonesty," as used in *former* DR 1-102(4), is broader than its companion terms "fraud" and "deceit." It connotes lack of trustworthiness and integrity. *See In re Hockett,* 303 Or 150, 734 P2d 877 (1987). Likewise, "misrepresentation" is a broad term encompassing non-disclosure of material fact; it need not be done with the intent to deceive or commit a fraud. *In re Hiller,* 298 Or 526, 694 P2d 540 (1985). The facts we have found constitute both dishonesty and misrepresentation under *former* DR 1-102(A)(4). The

accused, whose argument has been with what facts we should find, not with what adverse facts (if found) would mean, does not seriously argue otherwise.

## THE ACCUSED'S EVIDENTIARY CLAIM

■ Our findings as to the Bar's two Causes of Complaint ignore certain evidence offered by the accused and rejected by the Trial Panel. The evidence came from a reputable and experienced member of the Bar who had served for approximately 15 years on the Bar's Legal Ethics Committee. That lawyer offered what was labeled by counsel for the accused an "expert opinion" as to whether the conduct of the accused violated the disciplinary rules.[3]

This court previously has expressed its reservations about the propriety of this kind of testimony in disciplinary cases. *See In re Brandsness,* 299 Or 420, 434, 702 P2d 1098 (1985). This case shows why. If the expert testimony were offered to explicate some external standard of actual practice, it might be admissible. However, DR 1-102(a)(3) does not involve such a standard. The evidence therefore amounted to nothing more than an oral brief as to why one particular construction of the governing disciplinary rule would not be violated by a particular hypothetical set of facts. The accused was able to make the same legal arguments through counsel, and did so. The evidence was not admissible.

## SANCTION

Although neither side specifically anticipated the factual conclusions that this court has reached, both sides have briefed the issue of sanctions with reference to the American Bar Association Standards for Imposing Lawyer Sanctions, § 3.0. *See In re Willer,* 303 Or 241, 250, 735 P2d 594 (1987); *In re Germundson,* 301 Or 656, 664, 724 P2d 793 (1986). Under those standards, the court should consider the following factors:

---

[3] The accused argues that such an opinion is admissible under OEC 702, which provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

(a)   the duty violated;

(b)   the lawyer's mental state;

(c)   the actual or potential injury caused by the lawyer's misconduct;

(d)   the existence of aggravating or mitigating factors.

The duty to maintain personal honesty and integrity in his professional activities is one of a lawyer's most basic obligations to the public. *See, e.g., In re Glass,* 308 Or 297, 779 P2d 612 (1989); *In re Hockett, supra,* 303 Or at 159; *In re Hiller, supra,* 298 Or at 534. The accused had the conscious objective of defeating the specific expectations of the Gingeriches by eliminating the rent floor provision in the lease, while concealing that effect from them. The accused's actions resulted in a significant financial loss to the Gingeriches, not to mention attorney fees sustained in attempting to recoup that loss. All these considerations call for a sanction greater than the reprimand imposed by the Trial Panel.

On the other side of the ledger, there are several mitigating factors. The accused has had no prior disciplinary record in many years of private practice. The accused's character and reputation both inside and outside the Bar have been, up to this incident, enviable. He enjoyed and, from the testimony, continues to enjoy, the highest regard of his professional colleagues, his fellow churchgoers, his clients, and his community. Moreover, the accused's degree of cooperation with the Bar was, if anything, even greater than that which we normally would expect of an accused lawyer.

These competing factors, *viz.,* the seriousness of the misconduct on the one hand, its isolation and apparent inconsistency with the accused's entire professional and personal life on the other, make this a difficult case in which to select a sanction. A long suspension or disbarment clearly is unwarranted.

We do believe, however, that some period of suspension is necessary in light of the accused's state of mind and motive and the vulnerability of the Gingeriches. In this case of an isolated but serious violation of *former* DR 1-102(A)(4), we suspend the accused from the practice of law for a period of 35

days, with the period of suspension to begin the day following the date upon which this opinion becomes final. *See in re Houchin,* 290 Or 433, 622 P2d 723 (1981) (30-day suspension for single violation of *former* DR 1-102(A)(4)); *In re Hedges,* 280 Or 155, 570 P2d 73 (1977) (same).

In selecting the appropriate sanction, we have also considered the arguments submitted by a member of the Bar as *amicus curiae.* The essence of the theory of the *amicus* is contained in the following summary of his argument:

> "The Bar should not be allowed to seek review of a Trial Panel's recommended disposition soley [*sic*] for the purpose of seeking additional or increased sanction and the court should not allow such review and/or impose any sanction greater in nature than the disposition recommended by the Trial Panel."

Elsewhere, *amicus* labels the Bar's request for a greater sanction "improper, without lawful authority and unfair" and "an extreme abuse by the Bar of its discretionary powers." We quote the argument of *amicus* because it seems appropriate to explain why we reject them.

■ The Bar has the authority to seek a greater sanction. BR 10.3. This court can impose a greater sanction (including disbarment) than that recommended by the Trial Panel, without any such recommendation from the Bar. *See In re Miller,* 303 Or 253, 735 P2d 591 (1987). The Bar's exercise of its authority in this case, far from being the "extreme abuse of discretion" that *amicus* contends it to be, is fully validated by the conclusion this court has reached concerning the sanction.

The accused is found not guilty on the Bar's first cause of complaint. He is found guilty on the Bar's second cause of complaint and is suspended from the practice of law for 35 days. The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.536(4).