Argued and submitted April 10, accused found not guilty of professional misconduct;
complaint dismissed November 26, 1990

In re Complaint as to the Conduct of

# ROGER G. WEIDNER,
*Accused.*

## (OSB 86-138; SC S36671)

801 P2d 828

Roger G. Weidner, Portland, argued the cause and filed the briefs *pro se* for the accused.

Martha M. Hicks, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

Before Peterson, Chief Justice, Carson, Gillette, Van Hoomissen, Fadeley, and Unis, Justices, and Graber, Justice pro tempore.

PER CURIAM

## PER CURIAM

■ In this lawyer discipline case, we determine *de novo* whether accused violated (1) two disciplinary rules prohibiting conduct involving dishonesty, fraud, deceit or misrepresentation, and knowingly making a false statement of law or fact, and (2) four disciplinary rules regulating conflicts of interest between a lawyer and a client or among multiple clients of the same lawyer.[1]

Because the dishonesty or deception charges are not supported by evidence of any knowingly false statement, dishonesty, fraud, deceit, or misrepresentation, we dismiss them, as did the Trial Panel. We also hold that the conflict of interest disciplinary rules depend on the existence of a lawyer-client relationship. Because we are not convinced by the evidence that such a relationship existed between accused and those alleged to have considered themselves his clients in the relevant transactions, we dismiss the conflict of interest charges.

### FACTS

Accused joined Mr. and Mrs. Hartley, Ron Claxton, who was a relative of the Hartley's, and James Sanders to form a trucking-related business corporation. The Hartleys, Claxton, Sanders and accused each received equal shares. During the relevant period, the business was known as Container Transfer Service and also as Marine Transport Company (MTC). Accused served as a corporate officer and performed the company's legal work.

Before events significant to this case occurred, accused was acquainted with George Miljus. Accused once was Miljus' tenant; both were former Portland firefighters. Miljus knew accused was a lawyer but had never employed him as such. Accused knew that Miljus was interested in making secured loans and had lent money to another trucking business.

When a cash-flow problem developed at MTC, accused contacted Miljus seeking a loan to MTC. Miljus knew,

---

[1] Proof of disciplinary violations requires clear and convincing evidence. Rules of Procedure (BR) 5.2. BR 10.6 specifies *de novo* review.

at this point, that accused was an officer and a shareholder in MTC.

The transactions giving rise to the Bar's charges were three-sided. MTC sought a loan from Miljus. As part of the security for repayment, MTC offered mortgages on some of its individual shareholders' separate interests in certain real properties. MTC paid these shareholders' fees for using their properties as security.

Miljus dictated terms and preconditions to be met before he would loan MTC the funds. Accused performed the tasks required to meet those terms and preconditions. Miljus required that his security be documented. When accused prepared the real property mortgages as part of the loan transactions, he used a legal stationer's preprinted form that provided, among other things, that "mortgagor covenants * * * that he is lawfully seized in fee simple of said premises and has a valid, unencumbered title thereto." The mortgagors did not, however, hold clear titles.

As required by Miljus, accused provided Miljus with title company lot book reports showing the condition of title of the Hartley and Claxton properties, and the tax assessor's appraisal values for them. Miljus reviewed these documents to determine whether the equity values of the properties offered as security, after deducting encumbrances shown in the lot book reports, exceeded by 20 to 25 percent the amount that he was to loan. Bar counsel stipulated that lot book reports were provided to Miljus, that the reports showed the condition of title of the properties, and that the reports were provided before mortgages were executed to secure repayment of the loans. Miljus also personally visited the properties to view the nature and condition of improvements.

Several loan transactions were entered into over a fourteen-month period. Original loan notes drawing 20 percent interest, executed in 1979 and in July of 1980, were replaced with 24-percent interest notes in December of 1980 and January of 1981, when Miljus agreed to renewal of the loans and refinancing of the principal balances then overdue. Miljus dictated both the 20-percent and the 24-percent interest rates.

Although accused had signed some of the prior notes

as Miljus required, individually promising to repay them if MTC defaulted, he did not co-sign the renewal notes, and no one requested that he do so. Miljus testified that, at the time the replacement notes were signed, he was aware that accused had not signed the new notes. There is no evidence of whether the Hartleys knew that accused had not signed the renewal notes; Claxton was not concerned that accused did not sign them.

One part of the renewal and replacement security arrangement involved adding property on Columbia Boulevard offered by Claxton as further security. Accused notarized Claxton's signature executing a mortgage on that property for Claxton, and also "by power of attorney" for Vicki Hansen, who claimed an interest in that property. The Bar and accused disagree as to whether Vicki Hansen's power of attorney, authorizing Claxton to sign for her, was displayed by Claxton to accused at the time accused notarized the Columbia Boulevard mortgages.

When MTC did not repay the 24 percent notes, Miljus hired a lawyer to recover from the loans' security and from accused's professional liability insurance. A 1983 court decision held that Vicki Hansen's interest in the Columbia Boulevard property could not have been encumbered by Claxton because no valid power of attorney existed. Miljus received one of Hartley's properties in part payment but found the equities in the other Hartley and Claxton parcels not worth pursuing.

### THE BAR'S CHARGES

DR 1-102, in the form in effect at the relevant time, provided in part:

"(A) A lawyer shall not:

"* * * * *

"(4) Engage in *conduct involving dishonesty, fraud, deceit,* or *misrepresentation.*" (Emphasis added.)

DR 7-102 provided in part:

"(A) In his representation of a client, a lawyer shall not:

"* * * * *

"(5) *Knowingly make a false statement of law or fact.*" (Emphasis added.)

## A. Dishonesty and Deception[2]

The Bar charged deception and dishonesty based on three theories: misrepresentation as to condition of title of each parcel by words preprinted on the stationer's mortgage form; misrepresention that Claxton held an interest in the Columbia Boulevard property and had authority to sign for Vicki Hansen, accomplished by notarizing Claxton's signature for Vicki Hansen "by power of attorney"; and tender of the Columbia Boulevard mortgage to Miljus "when accused had no reason to believe" that Claxton was authorized to sign on Hansen's behalf.

In briefing and argument, the Bar also claimed that accused's failure personally to sign any of the 24-percent replacement notes violated the deception or dishonesty disciplinary rules. This separate argument fails for lack of testimony to support it, from any party to the transaction, that accused was expected to sign or evincing surprise or concern that accused failed to sign. Those who testified said they knew accused did not sign the refinancing notes.

## B. Client Conflicts of Interest

Disciplinary rules regulating conflicts of interest, in effect at the relevant time, provided in part (emphasis has been added):

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his *client* will be or reasonably may be affected by his own financial, business, property, or personal interests." DR 5-101(A).

"A lawyer shall not enter into a business transaction with a *client* if they have differing interests therein and if the *client* expects the lawyer to exercise his professional judgment therein for the protection of the *client*, unless the *client* has consented after full disclosure." DR 5-104(A).

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of

---

[2] "Dishonesty" is broader than its companion terms "fraud" and "deceit." *In re Leonard*, 308 Or 560, 569, 784 P2d 95 (1989). Likewise, "misrepresentation" is a broad term encompassing nondisclosure of a material fact. *Ibid.* This opinion uses the phrase "dishonesty and deception" to refer to all four concepts in DR 1-102 and to knowingly false statements of law or fact in DR 7-102.

a *client* will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B)    A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a *client* will be or is likely to be adversely affected by his representation of *another client,* except to the extent permitted under DR 5-105(C).

"(C)    In the situations covered by DR 5-105(A) and (B), a lawyer may represent *multiple clients* if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." DR 5-105.

The words emphasized indicate that the lawyer-client relationship is an element required by each of the conflict of interest disciplinary rules.

The Bar's complaint does not directly or separately allege any specific lawyer-client relationship, but it does allege:

"Both Mr. and Mrs. Hartley and Miljus reasonably assumed that the Accused was acting as their lawyer in handling the note and the mortgage transactions for the benefit of MTC. * * *

"By reason of the Accused being a shareholder and director of MTC, obligating himself jointly on promissory notes to Miljus and failing to disclose to the Hartleys or Miljus the extent of his representation of them. * * *

"By reason of his involvement in the transactions among MTC, the Hartleys and Miljus, all of whom had adverse interests in the transactions and each of whom believed himself or herself to be represented by the Accused."

The Bar alleged that accused's acts in the loan transactions violated the relevant disciplinary rules. In effect, the Bar argues that, because some of the services performed by accused were of the kind that lawyers traditionally perform for clients, all the persons involved on all three sides of the transaction were the clients of the lawyer performing the services.

The Bar and accused agree that MTC was accused's client when he performed the tasks. The Bar asserts that both

Miljus and the shareholders who put up their property interests as security were also his clients in the transactions.

## TESTIMONY OF PUTATIVE CLIENT

We turn to an examination of the testimony on which the Bar relies to establish the lawyer-client relationship. The Hartleys were not called as witnesses. Claxton testified that accused had never been his lawyer. Miljus' testimony follows:

"Q. In your mind, Mr. Miljus, did you feel that in procuring these reports and in playing the role that he played in this transaction, that he was acting as your attorney?

"A. In a sense, yes.

"Q. Well, tell the panel what you mean, please, when you say 'in a sense.'

"A. I told him I would loan the money on the property providing he would provide me a title that showed what the encumbrances was [sic] on the property, and that whatever legal work that was done there would be handled.

"* * * * *

"Q. You knew at that time, of course, that [accused] was an attorney?

"A. Yes, I knew he was an attorney.

"Q. And did you know that he was president of Marine Transport?

"A. Yes, I had a document that showed that.

"Q. Did [accused] ever tell you that he was not acting as your attorney in connection with the loan transaction in December of 1979?

"A. That was never brought up.

"Q. Did he tell you that he was acting as attorney for Marine Transport and/or the Hartleys in connection with that transaction?

"A. No."[3]

Concerning the July 1980 notes, secured only by UCC form notice of assignment of accounts receivable, and signed by accused as president and as an individual, Miljus testified:

---

[3] Accused did not expressly explain to all of the parties, either orally or in writing, whom he did, and did not, represent.

"Q. And is it your understanding that [accused] prepared those filing papers?

"A. Yes.

"Q. And is it your belief that in preparing those papers, he was acting as your attorney?

"A. Yes.

"Q. In order to protect your interests?

"A. Yes.

"* * * * *

## "CROSS-EXAMINATION

"BY [ACCUSED](who represented himself in the proceeding):

"Q. Mr. Miljus, Mr. Renner asked you if it was not your belief that [accused] was acting as your attorney in consummating these transactions.

"A. Yes.

"Q. Now, I'm going to differentiate here. Did you pay [accused] any money for any legal work?

"A. No.

"Q. Go ahead. Do you want to expand on the answer?

"A. The basis of my loaning the money was if I could get a title showing the liens and encumbrances on the property and the legal portion of the work being done for these loans, that was why I loaned the money, because I know nothing about loaning money, and that was my recollection of why I made the loans.

"* * * * *

"Q. But as far as relying on legal advice from [accused], the work that [accused] did was basically providing documentation for — to you; is that not correct?

"A. Correct, providing documentation and handling whatever legal work was associated with the loans.

"Q. But [accused] never acted as your attorney in the transactions?

"A. Well, he — I put it the way I — the way I loaned the money, was if this was being done, I would loan the money.

"Q. You've used in response to one of Mr. Renner's questions, you said you told [accused]. You told [accused] under

what circumstances you would loan money; is that not cor-
rect?

"A.   That's right.

"Q.   So there was no — [accused] was not — you were not
consulting with him as an attorney as to whether or not you
should loan it, you were telling him that you were — under
what circumstances you would, in fact, loan it; is that not
correct?

"A.   Yes, I would — yes."

Elaborating on his requirement that "whatever legal
work that was done there would be handled," Miljus testified,
"Provided, you know, the legal, you know, provide the title
and make sure it was authenticated."

Accused testified that he represented only MTC.

## THE TRIAL PANEL'S FINDINGS

■■   The Trial Panel found accused not guilty of violating
the dishonesty or deception disciplinary rules, because Miljus
"understood that the properties in which he would obtain a
security interest were encumbered in some respect." To these
findings we would add that, as the Bar stipulated, lot book
reports were provided to Miljus showing the ownership of the
parcels before the mortgages were issued or the funds
advanced. Concerning the words covenanting clear title in the
preprinted mortgage form, accused testified that he was not
aware of them. We accept his uncontradicted testimony, as
did the Trial Panel. Whatever may be the standard of care
required in a professional negligence setting, a misrepresenta-
tion does not violate DR 7-102 unless it is made "knowingly"
or recklessly. DR 7-102(5).

■   As to the Columbia Boulevard property, we adopt the
Trial Panel's description of the basis for accused's notariza-
tion of the mortgage, as follows:

"The Accused's testimony is that he believed Claxton had this
authority because of the telephone call [wherein accused
heard a woman's voice, whom he testified he believed was
Hansen, authorize using "her" property as security] and the

power of attorney. Claxton confirmed this, although his testimony lacked credibility.[4]

"Based on the evidence, the [Trial] Panel cannot find with certainty that the Accused acted deceitfully with regard to this transaction."

Accused is not guilty of violating DR 1-102 or DR 1-702, the dishonesty and deception disciplinary rules. The remainder of this opinion concerns the conflict of interest disciplinary rules.

The Trial Panel did not expressly find, nor has the Bar expressly alleged, that a lawyer-client relationship existed.

Trial Panel findings on that subject follow:

"The [Trial] Panel finds that Miljus had a reasonable expectation that the Accused would act on behalf of his financial and legal interests. The Accused and Miljus were friends. Miljus knew the Accused was a lawyer. The Accused solicited the loans from Miljus. The Accused provided lot book searches and computer printouts showing tax appraised values [as lender requested]. The Accused prepared notes and mortgages and had the mortgages recorded. The Accused prepared a UCC form. These were prepared entirely for the benefit of Miljus.[5] The Accused knew Miljus was concerned about obtaining adequate security for his loans. The Accused never advised Miljus that he was not acting on his behalf, that he was not acting as his attorney, and that he should seek other counsel.

"* * * * *

"The Accused provided legal services and entered into business relations with Miljus and Hartleys * * *. The

---

[4] The Bar attempted to impeach accused's testimony that he had seen a power of attorney at the time he accepted Claxton's signing of the documents for Hansen. Bar counsel called the lawyer whom Miljus employed in his efforts to recover. That lawyer testified that accused did not mention a power of attorney in his deposition taken for the 1983 action wherein the court held against Miljus and for Vicki Hansen. However, accused later produced for the Trial Panel a deposition page clearly showing accused's testimony that he saw a power of attorney, confirmed in part by telephone by a woman accused believed to be Hansen. Claxton swore that he exhibited a power of attorney to accused, but that it was bogus, and that he procured another woman to pose as Hansen in the telephone conversation.

No other evidence was offered by the Bar that contradicted or impeached accused's testimony on any other point.

[5] The Bar alleged "the mortgage transactions [were] for the benefit of MTC."

Accused provided services to multiple clients without making adequate disclosure and obtaining consent, assuming that they could have been validly obtained."

## ANALYSIS

■ The Code of Professional Responsibility did not and does not define the point at which a lawyer-client relationship comes into existence. But existence of that relationship is a necessary element of the disciplinary rules at issue here; no violation may be found unless that element is proved. This court must first determine whether a lawyer-client relationship existed, and with whom, at the time accused is alleged to have violated the four conflict of interest disciplinary rules.

Where this court has found the relationship to exist, the factual circumstances have usually included an undisputed past relationship or the lawyer's admissions evidencing the relationship or both.[6] Accused has made no admissions evidencing a lawyer-client relationship with Miljus. However, two kinds of evidence that such a relationship existed are present: (1) the services performed were of the kind traditionally done professionally by lawyers, *i.e.*, legal work, and (2) the putative client intended that the relationship be created. Performing legal work was evidence of the relationship in *In re Bristow,* 301 Or 194, 721 P2d 437 (1986). In *Bristow,* the lawyer formed the relationship with the second client even though he foresaw potential litigation by his first clients against the second client. Proof of lawyer Bristow's relationship with the second client included a letter from the lawyer recognizing that the parties would be working together to protect the second client's interests, providing legal advice, and stating arrangements for billing lawyer fees, costs, and disbursements. *See also In re Robertson,* 290 Or 639, 624 P2d 603 (1981)(drafting real estate contract, option and letters advocating rights of clients as to claims of third parties indicated that lawyer undertook representation of clients).[7]

---

[6] *See, e.g., In re Bristow,* 301 Or 194, 201-02, 721 P2d 437 (1986); *In re Jans,* 295 Or 289, 666 P2d 830 (1983); *In re Robertson,* 290 Or 639, 624 P2d 603 (1981); *In re Galton,* 289 Or 565, 580-81, 615 P2d 317 (1980); *In re Hershberger,* 288 Or 559, 606 P2d 623 (1980).

[7] This court has pointed out that creation of the lawyer-client relationship requires no retainer or other express written or oral agreement. *In re Bristow, supra,* 301 Or at 202; *In re Robertson, supra,* 290 Or at 648. Absence of an explicit agreement, of course, adds nothing to the evidence on the issue of whether the lawyer-client relationship exists.

Concerning the second kind of evidence, in *In re O'Byrne,* 298 Or 535, 694 P2d 955 (1985), this court, in finding that a lawyer-client relationship existed, noted the intent of "clients" to employ the accused as their lawyer. The clients in *O'Byrne* loaned the lawyer money, at least in part, because the lawyer advised them that it would be easier to immigrate to this country if they had investments here. Legal advice and legal representation before government agencies were also involved. There was no other client for whom these acts might have been performed.

This court has also discussed lack of intent to form the relationship, in determining whether the relationship exists. In *In re Mettler,* 305 Or 12, 20, 748 P2d 1010 (1988), the court found that a lawyer-client relationship did not exist. *Mettler* held that, where a lawyer is employed by a state agency in a position that does not require that the employee be a lawyer, the state was not a "client" of the lawyer for purposes of a disciplinary rule. Outward appearances, as viewed by third parties, were not enough. The court commented that: "[I]t is unlikely that a lawyer-client relationship will exist when neither the lawyer nor the 'client' intend such relationship."[8] The accused, in *Mettler,* contended "that the existence of a lawyer-client relationship should be judged by a subjective standard [in that case, what was in the lawyer's mind]." *Id.* at 18. This court, in *Mettler,* did not decide whether objective evidence was required to prove the intent of either the lawyer or the putative client.

■■ It is clear in the present case that accused was representing the business borrower, MTC, at the times of the loan transactions. Thus, a conflict of interest between multiple clients would be established if accused were also shown to be in a lawyer-client relationship with Miljus or the other parties alleged — Claxton and the Hartleys — in relation to those transactions. There is no evidence that the Hartleys ever contended or believed that accused represented them personally. Claxton denied that accused ever represented him. We turn,

---

[8] We noted in *In re Mettler,* 305 Or 12, 748 P2d 1010 (1988) that "in some circumstances, a lawyer and another may be estopped, on agency principles, from claiming that a lawyer-client relationship did not exist in fact." *Id.* at 20 n 12, *citing Lehman v. Knott,* 100 Or 240, 246, 187 P 1109 (1920). The court added that *Mettler* did not present "such a circumstance."

then, to a discussion of accused's relationship with Miljus, which is the heart of the Bar's case.

## A. Testimony Does Not Establish That Accused Was Miljus' Lawyer

█ Accused and Miljus were acquainted prior to the loan transaction between the trucking business and Miljus. However, no lawyer-client relationship had existed between them in the past.

█ █ There is no evidence of any express lawyer-client relationship between accused and Miljus, or anyone else other than MTC. However, *In re Mettler, supra,* did not resolve the objective versus subjective evidence question, but suggests the possibility that the relationship may exist when the client reasonably expects that it has been established. We hold that, to establish that the lawyer-client relationship exists based on reasonable expectation, a putative client's subjective, uncommunicated intention or expectation must be accompanied by evidence of objective facts on which a reasonable person would rely as supporting existence of that intent; by evidence placing the lawyer on notice that the putative client had that intent; by evidence that the lawyer shared the client's subjective intention to form the relationship[9]; or by evidence that the lawyer acted in a way that would induce a reasonable person in the client's position to rely on the lawyer's professional advice. The evidence must show that the lawyer understood or should have understood that the relationship existed, or acted as though the lawyer was providing professional assistance or advice on behalf of the putative client, as the lawyer did in *In re Bristow, supra.*[10]

---

[9] *See In re Johnson,* 300 Or 52, 61, 707 P2d 573 (1985) (lawyer must have knowledge of predicate facts disclosing an actual or likely conflict of interest).

[10] *See also* Friedman, *The Creation of the Attorney-Client Relationship: An Emerging View,* 22 Cal W L Rev 209, 213, 218 (1986); Case Comment, *Attorney Malpractice: Use of Contract Analysis to Determine the Existence of an Attorney-Client Relationship,* 63 Minn L Rev 751, 753-56 (1979). *Compare Steinbach v. Meyer,* 412 NW2d 917 (1987) (no lawyer-client relationship where no legal advice sought or given on subject), *with Franko v. Mitchell,* 158 Ariz 391, 762 P2d 1345 (1988) (interaction of lawyer in his office with "client" on legal sufficiency of document drafted for someone else), *and In re Petrie,* 154 Ariz 295, 742 P2d 796 (1987) (relationship proved when a party seeks and receives advice in matters pertinent to legal profession; subjective belief of "client" that relationship exists an important factor, where objective circumstances of case support that belief).

The testimony of putative client Miljus does not clearly and convincingly demonstrate that Miljus relied on the professional judgment of accused. The testimony demonstrates instead that Miljus stated certain requirements that the trucking company must meet before he would make the loan and that the lawyer facilitated MTC's compliance with Miljus' demands.

Miljus' testimony that he looked on accused as "in a sense, yes" his lawyer in the 1979 loan transaction and the December 1980 - January 1981 loan transactions is, at best, ambiguous. With respect to the July 1980 loan, Miljus answered "yes" to the question, "Is it your belief that in preparing those papers, he was acting as your attorney?"

The context of those answers makes them less than clear and convincing evidence of a lawyer-client relationship. Miljus did not unequivocally contend that accused was his lawyer in the 1979 mortgage transaction. He asked accused to sign one of the notes personally and thus to become personally responsible for its repayment. Neither did Miljus testify unequivocally that accused was his lawyer in the 1980-81 mortgage transactions, where Miljus made no request that accused co-sign individually. But with regard to the July 1980 loan, where accused signed the note as president of the borrower corporation, and Miljus again required accused to co-sign individually, Miljus contended that accused was his lawyer.

It appears that, when Miljus relied on his own examination of the appraised values and title documents and his own view of the property before deciding to lend money, he did not believe that accused, who prepared the mortgage documents securing the loan, was acting as his lawyer. In contrast, when Miljus played no part in selecting or preparing the UCC filing or verifying the accounts receivable used as security, he believed that the person preparing the documents was his lawyer. Thus, Miljus' definition of who is his lawyer seems to turn entirely on the presence or absence of his personal supervision. That, however, is not the definition of the professional relationship on which the disciplinary rules are premised.

### B. Inferences Do Not Establish Lawyer-Client Relationship Here

Other facts suggest that Miljus did not consider accused to be acting as a lawyer on his behalf. When a person

lends money to an incorporated business and asks its principals to co-sign individually, it seems unlikely that the lender considers those principals to be the lender's agents, rather than agents of the borrower. Miljus' requirement that accused co-sign the documents displays his awareness that accused was allied with the borrower, rather than with Miljus.

The Bar also contends that, "because the Accused was an obligor on the original notes," he was required to assume that Miljus was relying on him for the legal aspects of the transaction. The Bar relies on *In re Montgomery,* 292 Or 796, 643 P2d 338 (1982). In *Montgomery,* the lawyer-client relationship was obvious, on-going, and not contested. The lawyer borrowed money from his own client, but the loan was not what created the lawyer-client relationship. Accordingly, the case does not advance the Bar's position. Moreover, we do not draw the inference for which the Bar contends from the fact that Miljus requested accused to co-sign the notes. Miljus never believed that the money was for accused but understood that it was borrowed for the trucking business.

### C. Rendering Professional Services Does Not Establish Relationship With Second Client

██ ██ The Bar relies on the following additional evidence regarding the mortgage transactions in 1979 and 1980-81: that Miljus picked up one mortgage, after recording, at accused's office in an envelope bearing the lawyer's professional title and address; that the selection of the mortgage form to be used (the legal stationer's printed form) is the kind of service a lawyer provides to a client; that some of the funds passed through the lawyer's hand on the way to MTC; and that some of the documents passed through his hands on the way back from the courthouse to Miljus.[11]

---

[11] The Bar also contends that accused gave legal advice to Miljus. The question of whether accused originated the idea of increasing the initial loan amount from $50,000 to $50,001, in order to come within an exception to usury laws, is not mentioned in the Bar's charges, directly or indirectly. No findings or conclusions of the Trial Panel refer to the subject. The *only* mention by the Trial Panel is in its "Summary of Evidence" as follows:

"The reason for the $1 beyond the sum of $50,000 was purportedly to avoid the then-existing usury laws, given the high rate of interest. The Accused contends [Miljus] suggested the additional $1; [Miljus] contends the Accused suggested it."

Miljus testified, after stating, "[M]y recall isn't that great." The evidence is insufficient to establish clearly and convincingly as fact that accused gave legal advice to anyone on the subject.

Those facts are not clear and convincing proof of a lawyer-client relationship, again because of their context. Accused contacted Miljus *on behalf of MTC,* as all parties understood from the outset. All understood that the loan was to be to MTC. The facts of returning recorded mortgages in an envelope imprinted with accused's name as lawyer and of supplying a preprinted mortgage form do not necessarily demonstrate that accused was providing legal services to Miljus. Rather, it appears from the evidence that these acts were taken on MTC's behalf to satisfy Miljus' preconditions for making the loan and that Miljus knew that.

The Bar's contention that a lay person's reliance on a lawyer in any way in a transaction creates a lawyer-client relationship bears added discussion. In this case, Miljus appears to have relied on two things: accused's non-professional status as a principal of the borrower and accused's legal services *to another party to the transaction,* when Miljus knew that accused was acting for that other party. Miljus apparently wanted to save money by not hiring his own lawyer to consider his interests and by allowing (or requiring) the borrower and the borrower's lawyer to perform the tasks involving out-of-pocket expenses. The first kind of reliance is not reliance on professional judgment and, therefore, does not create a lawyer-client relationship. With respect to the second kind of reliance, a person cannot at once create a lawyer-client relationship and a conflict of interest by deciding to rely on a lawyer's advice to another party to the transaction, not without alerting the lawyer in some way. *See In re Banks,* 283 Or 459, 470-71, 584 P2d 284 (1978).

The evidence does not show that Miljus alerted accused to his asserted reliance on accused's professional advice; nor were the surrounding circumstances sufficient to alert accused to Miljus' asserted reliance on his professional advice or services to others. No evidence adduced shows that accused acted in a way toward Miljus that would reasonably have induced Miljus, in the circumstances of this case, to form the subjective intent to rely on accused as being anyone's lawyer other than MTC's.

Accused is not guilty of professional misconduct charged. Complaint dismissed.