Argued and submitted March 3, accused reprimanded August 17, 2000

## In re Complaint as to the Conduct of

### DANIEL J. GATTI,
*Accused.*

### (OSB 95-18; SC S45801)

8 P3d 966

Christopher R. Hardman, Portland, argued the cause and filed the brief for the accused.

Mary A. Cooper, Assistant Disciplinary Counsel, Oregon State Bar, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

Robert K. Udziela, Portland, filed a brief for *amici curiae* Oregon Consumer League, Fair Housing Counsel of Oregon, Oregon Law Center, Kathryn H. Clarke, Esq., Jeffrey P. Foote, Esq., William A. Gaylord, Esq., Phil Goldsmith, Esq., Maureen Leonard, Esq., and David F. Sugerman, Esq.

Kristine Olson, United States Attorney, Portland, filed a brief for *amici curiae* United States Department of Justice and United States Attorney's Office District of Oregon. With her on the brief were Michael W. Mosman, Assistant United States Attorney, and Phillip Schradle, Assistant Attorney General, State of Oregon.

PER CURIAM

## PER CURIAM

In this lawyer discipline proceeding, the Oregon State Bar (Bar) seeks review of a decision by a trial panel of the Disciplinary Board. ORS 9.536(1); Bar Rule of Procedure (BR) 10.1 and BR 10.3. The Bar charged the accused with violating Code of Professional Responsibility Disciplinary Rule (DR) 1-102(A)(3) (conduct involving dishonesty, fraud, deceit or misrepresentation), DR 7-102(A)(5) (knowingly making false statement of law or fact), and ORS 9.527(4) (willful deceit or misconduct in the legal profession). The accused defended, in part, on the theory that there are or should be exceptions to those rules and the statute in some situations. The trial panel concluded that the accused had committed the violations, but it dismissed the Bar's amended complaint, holding that the Bar was estopped from prosecuting the accused. We review the decision of the trial panel *de novo*. ORS 9.536(3); BR 10.6. For the reasons that follow, we hold that the Bar was not estopped from prosecuting the accused, that the accused violated both the rules and statute identified above, and that the accused's defense based on the state and federal constitutions is not well taken. We also conclude that, under the circumstances of this case, the appropriate sanction is a public reprimand.

## I. FACTS

We find the following facts by clear and convincing evidence. Before the accused engaged in the conduct at issue in this proceeding, he represented several chiropractors who had been charged with racketeering and fraud. Those charges arose out of an undercover investigation, called Operation Clean Sweep, that SAIF Corporation (SAIF) and the Oregon Department of Justice (DOJ) had conducted. In 1992, the accused filed a complaint with the Bar, alleging that the lawyers involved in Operation Clean Sweep had advised SAIF investigators to have individuals pose as janitors and injured workers for the purpose of infiltrating chiropractors' and lawyers' offices to obtain information about suspected fraudulent workers' compensation claims. The accused's complaint asserted that the lawyers who provided

that advice had violated several rules of the Code of Professional Responsibility, including the rules that are at issue in this proceeding.

The Bar investigated the accused's complaint. On June 16, 1993, disciplinary counsel to the Bar wrote to the accused:

"Because of the general nature of your allegations and the lack of any named respondent, the Bar was unable to follow its normal investigative process, which consists of forwarding a copy of the complaint to the responding lawyer and asking for a response to the specific allegations. * * *

"* * * Our preliminary research focused on whether a governmental agency, and lawyers working for that agency, have more latitude in carrying out the agency's regulatory powers in a surreptitious fashion than members of the Bar in the private sector. The answer to that question is not clear; however, our research does suggest that a prosecutor is required only to avoid the use of *illegal* means to obtain evidence directly or indirectly through others. The cases we have reviewed seem to indicate that a prosecutor oversteps his bounds when he causes another to give false testimony under oath or to appear before a court or other agency who has not first been apprised of the deception and the reasons therefore.

"Our preliminary conclusion is that if SAIF is considered to have public authority to root out possible fraud, then attorneys assisting SAIF in this endeavor are not acting unethically in providing advice on how to conduct a *legal* undercover operation. It is our understanding that no court has found Operation Clean Sweep to have been illegal or to constitute prosecutorial misconduct."

(Emphasis in original; citations omitted.)

Disciplinary counsel thereafter submitted the accused's complaint to the State Professional Responsibility Board (SPRB). On March 25, 1994, an assistant disciplinary counsel to the Bar wrote to the accused that the SPRB had closed its file on the complaint because "there was no evidence that any [SAIF or DOJ] attorney violated any provision of the Code of Professional Responsibility in connection with Operation Clean Sweep or any other operation involving [SAIF or DOJ]."

In April 1994, Dr. Saboe, a chiropractor with whom the accused was acquainted, told the accused that a California company, Comprehensive Medical Review (CMR), had contacted Saboe to inquire whether he would serve as a medical reviewer for CMR. At that time, one of CMR's clients was State Farm Insurance Company (State Farm), and CMR provided it with medical review reports recommending whether to accept or deny medical claims. Saboe had a sense of "unease" about the methods that CMR used to recommend that State Farm deny benefits. The accused subsequently came to believe that individuals other than medically trained personnel were preparing reports for CMR, that they were using a "formula" that was designed to help State Farm contain costs, and that medical reviewers were signing the reports.

On May 17, 1994, the accused received a copy of a CMR report that had been signed by Dr. Becker, a California chiropractor, concerning a claim that a client of the accused had filed with State Farm. The accused believed that State Farm had denied the claim based on Becker's report. The denial made the accused angry, and he made three telephone calls to CMR personnel. Before placing the calls, he did not perform any legal research regarding this court's case law on the subject of whether a lawyer who misrepresents his or her identity or purpose violates lawyer disciplinary rules. According to the accused, he made the calls intentionally, but they were "an absolute fluke" and he made them "out of stupidity more than anything."

The accused first called Becker. He identified himself to Becker as a chiropractor and asked Becker about Becker's qualifications. Becker became uncomfortable with the accused's questioning and quickly discontinued the conversation, which the accused had tape recorded.

The accused then called Adams, a vice-president and director of operations for CMR. The accused introduced himself to Adams as a doctor with experience performing independent medical examinations and reviewing insurance claims. The accused contends that he did not tell Adams that he was a chiropractor, but he admits that he "wanted [Adams] to believe that [he] was a chiropractic physician."

The accused told Adams that he saw patients, that he performed independent medical examinations, that he performed file and case reviews, and that he was interested in participating in CMR's educational programs for insurance claims adjusters. The accused also told Adams that both Becker and State Farm had referred him to CMR, and that he was interested in working for CMR as a claim reviewer. The accused tape recorded most of his conversation with Adams, which he then had one of his secretaries transcribe. For his part, Adams took notes of the conversation.

Adams believed that the accused was a chiropractor and a likely prospect to work for CMR in Oregon. Adams referred the accused to Householder in CMR's Vancouver, Washington, office to discuss employment opportunities with CMR. The accused called Householder, who knew that the accused was a lawyer and that he was not interested in working for CMR. After he had made the calls to Becker, Adams, and Householder, the accused developed a plan for a fraud investigation involving CMR.

In June 1994, based on information that he had acquired from sources other than his telephone calls to Becker, Adams, and Householder, the accused filed an action in the United States District Court for the District of Oregon against CMR, State Farm, and Householder, alleging fraud and intentional interference with contractual relations.[1] On July 30, 1996, the District Court entered a protective order that covered all documents that had been produced in the Oregon case, including all depositions.

In July 1994, Adams filed with the Bar the present complaint. Among other things, Adams stated that the accused

"represented himself as an Oregon chiropractor who was interested in working with our company. He specifically stated that he was a Diplomate of the American Board of Chiropractic Orthopaedics.[2]

---

[1] The accused and lawyers with whom he was associated also filed claims against State Farm and CMR in other jurisdictions raising the same issues.

[2] As noted, although the accused admits that he wanted Adams to believe that he was a chiropractor, he denies that he told Adams that he was a chiropractor. The trial panel did not resolve that factual dispute. A finding either way would not

"* * * * *

"* * * [H]e continuously attempted to elicit specific information regarding the CMR protocols and guidelines which are used in preparing our reports. We consider much of this information to be confidential and proprietary. * * *

"* * * * *

"* * * The telephone call was made for the sole purpose of gathering unauthorized discovery for [his] lawsuit."

On August 2, 1994, in response to a request from assistant disciplinary counsel, Hicks, about Adams' complaint, the accused wrote that he had called Adams "*as a result of an investigation* that we have been conducting against Mr. Adams, Dr. Becker, Comprehensive Medical Review, and several others for racketeering and fraud." (Emphasis added.) The accused's letter stated, in part:

"In answer to Mr. Adams' specific charge that I represented myself as a chiropractor, that is absolutely false. I specifically told him that I was inquiring about their educational programs for claims adjusters and that I would like to participate in those programs. Mr. Adams asked if I was a doctor. He did not ask if I was a chiropractor. I told him I was a doctor and that I did file reviews by the hundreds. This, of course, is true."

Hicks then asked the accused to provide her with a copy of his medical license. The accused responded:

"* * * I am quite shocked at your request that I provide you with a copy of my medical license. * * * Your records reflect that I am a Doctor of Juris Prudence [*sic*] and that is not a misrepresentation.

"* * * There was no representation that I was a medical doctor and even if there was, under the circumstances of this fraudulent activity, that would not be unethical."

Hicks subsequently asked the accused for additional information in response to another letter that Adams had sent to the Bar alleging a variety of additional misrepresentations and false statements that the accused had made

affect our analysis in this case, because the accused admits that he wished to create a false impression with Adams, and that he did so.

when he had called Adams. On August 30, 1994, the accused responded, in part:

"I am not going to go into great detail about my conversation with Mr. Adams. *I was conducting a fraud investigation on behalf of several clients* and I am not going to be a witness nor a party to the litigation which will ultimately conclude in federal and state courts.

"* * * * *

"It is also astounding to me that Mr. Adams would continue to voice his contempt for my calling him and our discussion about how he conducts his wrongful business enterprise. * * *

"* * * * *

"I do not think that it is appropriate for the bar association to entertain the complaint of Mr. Adams in light of the serious allegations of criminal activity that have been leveled against his company and several others. There are literally hundreds if not thousands of complaints that will be forthcoming against Mr. Adams and his company or other defendants. When the litigation is over, the courts will clearly have identified who has been ethical and who has not.

"I have fully cooperated with the bar association on this matter and I do not believe you will need more information from me in order for you to proceed."

(Emphasis added.)

Approximately 15 months later, on November 6, 1995, after the accused had retained legal counsel to represent him in this matter, his lawyer sent Hicks a copy of a memorandum entitled "Summarization of Dan Adams" that the accused had prepared soon after his telephone conversation with Adams. In response, Hicks asked why the accused had not sent her a copy of the memorandum earlier in the investigation and whether the accused had prepared the memorandum using other notes or records. On January 9, 1996, the accused's lawyer responded that the accused had not sent a copy of the memorandum sooner because "he considered that document to be part of his attorney work product." The January 9 letter also stated:

"* * * [The accused's] memorandum was prepared by him from *other notes or other records* but, after a complete search for those, *they cannot be located.* [The accused] has instructed his office staff to continue to try to locate those materials, but we fear they are long gone. *If they are located, however, they will be provided to you.*"

(Emphasis added.) At the hearing before the trial panel, the accused testified that "other notes or records" included the transcript of his conversation with Adams and that, when the January 9 letter was written, he in fact had the transcript.[3]

In December 1996, the accused requested relief from the federal protective order to allow him to use information that he had acquired during the discovery process in the civil cases against State Farm to defend against the charges in this proceeding. The court allowed the accused to do so, and the accused thereafter sent the transcript to the Bar. The transcript made clear that the accused had told Adams that he was interested in working for CMR, that he was a doctor, that he saw patients, that he performed independent medical examinations, and that he was interested in becoming involved with CMR's educational seminars.

## II.   ESTOPPEL DEFENSE TO ALLEGED VIOLATIONS

■       In a single cause of complaint, the Bar charged the accused with violating DR 1-102(A)(3), DR 7-102(A)(5), and ORS 9.527(4), all arising from his telephone calls to Becker and Adams. We first address whether the trial panel erred in dismissing the Bar's complaint on the ground that the Bar was estopped from prosecuting the accused.

According to the trial panel, Bar counsel's responses to the accused's 1992 complaint against SAIF and DOJ lawyers "essentially represented to the Accused that SAIF's lawyers [*sic*] conduct does *not violate the* Code of Professional Responsibility, rather than representing to Accused that SAIF's lawyers were accorded a prosecutorial exception to the disciplinary rules." (Emphasis in original.) In the trial

---

[3] The accused's secretary testified that she, too, had a copy of the transcript at that time but that she had been unable to locate the audiotape that she had used to prepare the transcript.

panel's view, the accused reasonably inferred from those letters that, in the Bar's view, it is ethical for a lawyer in private practice to use deceptive methods to investigate other private parties. Accordingly, the trial panel concluded that, when the accused made the telephone calls to Becker and Adams, he believed that he was acting ethically.

The Bar contends that its letters to the accused did not state or imply that, in the Bar's view, it is ethical for a lawyer in private practice to use deceptive methods to investigate other private parties. Furthermore, it contends, its investigation of the accused's complaint simply had "turned up little if any reliable evidence" to support the accused's assertions regarding the lawyers who allegedly had been involved in Operation Clean Sweep, and its letters to the accused reflected that fact. The accused responds that the Bar's letters to him regarding his 1992 complaint against SAIF and DOJ lawyers reasonably led him to believe that lawyers in private practice as well as public lawyers may assist in a sting operation "that has essentially deceitful elements" without violating the Code of Professional Responsibility.

■ This court has held that a lawyer violates DR 7-102(A)(5) by misrepresenting the lawyer's identity while engaged in the practice of law. *See In re Chambers*, 292 Or 670, 680-81, 642 P2d 286 (1982) (lawyer's knowing misrepresentation of self as independent insurance agent violates DR 7-102(A)(5)). Even assuming that the accused relied on the Bar's letters in making the calls, his reliance was not reasonable. The Bar's letters neither stated nor implied that lawyers in the private practice of law may misrepresent their identity or purpose in investigating a matter. Moreover, advice from disciplinary counsel is not a defense to a disciplinary violation. *In re Ainsworth*, 289 Or 479, 490, 614 P2d 1127 (1980). The trial panel erred in holding that the Bar was estopped from prosecuting the accused for the alleged misconduct at issue in this case. We turn to the merits.

## III. ALLEGED VIOLATIONS

As noted, the Bar's single cause of complaint charged the accused with violating DR 1-102(A)(3), DR 7-102(A)(5), and ORS 9.527(4) in connection with his telephone calls to

Becker and Adams. The Bar's complaint alleged that the accused represented himself to Becker as a chiropractor and that he made several misrepresentations to Adams, including that he did independent medical examinations, that he was interested in working for CMR, that he did file and case reviews, that he saw patients, and that he was interested in participating in CMR's educational programs for insurance claims adjusters. The complaint also alleged that the accused failed to disclose that he was a lawyer, that he was preparing to sue CMR, and that he hoped that he would obtain information from the telephone calls that he could use in claims against CMR and Adams.

In his answer to the Bar's complaint, the accused admitted that he had engaged in the conduct alleged. The accused repeated those admissions during the hearing before the trial panel, and he testified that he had intended to deceive both Becker and Adams. The evidence demonstrates, as the trial panel found, that the accused was engaged in the practice of law when he made the telephone calls to Becker and Adams and that he had committed each of the charges.

Before this court, the accused contends that, by merely misrepresenting his identity and purpose for the sake of obtaining information, when there was no monetary or other injury involved, he did not violate the rules or the statute. The Bar contends that it has proven by clear and convincing evidence that the accused violated both the rules and the statute. We examine the rules and statute in turn.

DR 1-102(A)(3) provides that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." The term "dishonesty" in the rule connotes lack of trustworthiness and integrity. *In re Leonard*, 308 Or 560, 569, 784 P2d 95 (1989). Misrepresentation is a broad term that encompasses the nondisclosure of a material fact. *In re Weidner*, 310 Or 757, 762 n 2, 801 P2d 828 (1990). A misrepresentation may be a lie, a half-truth, or even silence. *In re Greene*, 290 Or 291, 298, 620 P2d 1379 (1980). A material fact consists of information that, if disclosed, would have influenced the recipient's conduct. *See Leonard*, 308 Or at 567-69 (failure to disclose true impact of interlineated items in lease material, because disclosure

would have prevented other signatories from initialing lease). Even a misrepresentation that is made with the best of intentions can be a misrepresentation under DR 1-102(A)(3). *In re McKee*, 316 Or 114, 125, 849 P2d 509 (1993).

A misrepresentation becomes fraud or deceit "when it is intended to be acted upon without being discovered." *In re Hiller*, 298 Or 526, 533, 694 P2d 540 (1985). However, a finding of fraud or deceit under the rule does not require evidence that the recipient of the misrepresentation relied on it. *See In re Benson*, 317 Or 164, 169, 854 P2d 466 (1993) ("It is enough that the accused tried to mislead.").

The prohibitions against dishonesty, fraud, deceit, and misrepresentation in DR 1-102(A)(3) are not limited to litigation or even to the representation of clients. *Hiller*, 298 Or at 532. To establish a violation of DR 1-102(A)(3), the Bar, at a minimum, must prove that the lawyer knowingly misrepresented a material fact. *Hiller*, 298 Or at 532.

As noted, the accused's answer to the Bar's complaint admitted the conduct alleged, and the accused notes that "the evidence that the Bar presented [during the two-day hearing before the trial panel] did nothing more than establish what [he] had repeatedly admitted." It is undisputed that the accused made affirmative misrepresentations to both Becker and Adams, and that he omitted material facts in his conversations with them. The accused also testified that his conduct was deceitful: He wanted Becker and Adams to believe that he was a chiropractor who wanted to work for CMR, and he intended to have both Becker and Adams make damaging statements about CMR's file-review practices.

We turn to the Bar's allegation that the accused violated DR 7-102(A)(5). That rule provides that, in the course of representing a client or the lawyer's own interests, "a lawyer shall not * * * [k]nowingly make a false statement of law or fact." To violate the rule, the false statement must be made with at least a knowing or reckless mental state. *Weidner*, 310 Or at 766. The focus of the rule is on the falsehood; it is of no significance that the recipient of the false statement was not misled by it. *See In re White*, 311 Or 573, 586, 815 P2d 1257 (1991) (irrelevant whether court was misled by lawyer's

false statements). A lawyer violates DR 7-102(A)(5) by misrepresenting his or her identity and purpose when contacting someone who is likely to be adverse to the lawyer's client. *Chambers*, 292 Or at 680-81.

In this case, the accused admits that he made a false statement to Becker when he told Becker that he was a chiropractor and that he made several false statements to Adams. For example, he told Adams that he saw patients and performed independent medical examinations, which he does not do, and that he was interested in working for CMR, when in fact he was not.

■ ■ Finally, we consider the Bar's allegation that the accused violated ORS 9.527(4). That statute provides that this court may

> "disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that * * * [t]he member is guilty of willful deceit or misconduct in the legal profession[.]"

Willful deceit or misconduct is synonymous with intentional deceit or misconduct: It is conduct that is intended to cause a particular result. *See In re Morris*, 326 Or 493, 502 n 2, 953 P2d 387 (1998) (distinguishing between knowing and intentional misconduct). The same conduct may violate both ORS 9.527(4) and DR 1-102(A)(3). For example, this court has held that a lawyer who endorsed another person's name on a check willfully violated both the statute and engaged in deceit under the disciplinary rule. *In re Yacob*, 318 Or 10, 17, 860 P2d 811 (1993). In this case, the accused admits that his conduct was both deceitful and intentional.

## IV. PROPOSED EXCEPTIONS TO RULES AND STATUTE

■ The accused contends that this court should adopt an investigatory exception to the disciplinary rules and the statute. He asks this court to adopt the following exception:

> "[A]s long as misrepresentations are limited only to identity or purpose and [are] made solely for purposes of discovering information, there is no violation of the Code of Professional Responsibility."

According to the accused, such an exception is necessary if lawyers in private practice, like their counterparts in the government, are to be successful in their efforts to "root out evil."

The trial panel refused to recognize an exception to the rules or statute either for government lawyers or lawyers in private practice. It held that "[t]he standards of conduct provided by the disciplinary rules apply to all members of the Bar, without exception." The trial panel also stated that, in failing to prosecute the SAIF and DOJ lawyers about whom the accused had complained in 1992, the Bar erroneously had relied on a "prosecutorial exception" to the rules. It warned that the Bar's "continued reliance on such an exception" will lead to more situations, such as occurred in this case, "where [the] Accused was seeking evidence of fraudulent conduct by CMR, and properly alleges that his attempt to uncover fraud is no less important than SAIF's attorneys' attempts."

Before this court, the United States Attorney for the District of Oregon, appearing as *amicus curiae*, objects to the trial panel's holding that there is no "prosecutorial exception" to the Code of Professional Responsibility in Oregon. She argues that the trial panel reached that conclusion "without examining the important purposes that are served by legitimate law enforcement undercover operations." The United States Attorney explains that the United States Department of Justice "regularly supervises and conducts undercover operations in Oregon that necessarily involve a degree of deception." Such covert operations involve both civil and criminal cases, ranging from enforcement of civil rights statutes to international narcotics conspiracies. She contends that federal courts long "have upheld the use of deceptive law enforcement tactics" and that she has "not found a single case in which deception and subterfuge are prohibited as a tool of law enforcement." The United States Attorney asks this court to adopt the following rule:

> "Government attorneys who advise, conduct or supervise legitimate law enforcement activities that involve some form of deception or covert operations do not violate DR 1-102(A)(3)."

The Attorney General for the State of Oregon agrees with the United States Attorney. He contends that this court should

"not interpret DR 1-102(A)(3) in a manner that would determine that government attorneys who advise, conduct or supervise legitimate law enforcement activities that involve covert operations violate that disciplinary rule."

The accused and, to a lesser extent, the United States Attorney, point to legal commentary and authority from other jurisdictions for the argument that this court should recognize an exception to the disciplinary rules that prohibit conduct involving dishonesty, fraud, deceit, misrepresentation, or false statements of law or fact. Those authorities assert that public policy favors an exception that, at the least, allows investigators and discrimination testers to misrepresent their identity and purpose when they are investigating persons who are suspected of engaging in unlawful conduct. *See* David V. Isbell and Lucantinoi N. Salvi, *Investigators and Discrimination Testers: An Analysis of the Provisions Prohibiting Misrepresentation Under the Model Rules of Professional Conduct*, 8 Geo J Legal Ethics 791, 801-04 (1995) (so stating). The rationale for such an exception is that there may be no other way for investigators or discrimination testers to determine if a person who is suspected of unlawful conduct actually is engaged in unlawful conduct. Therefore, the argument goes, the public benefits more from allowing lawyers to use deception than allowing unlawful conduct to go unchecked. *Id.* at 802; *see also Apple Corps Ltd. v. International Collectors Soc.*, 15 F Supp 2d 456, 475 (D NJ 1998) (lawyers in private practice may use "an undercover investigator to detect ongoing violations of the law * * *, especially where it would be difficult to discover the violations by other means"). *But see Sequa Corp. v. Lititech Inc.*, 807 F Supp 653, 663 (D Colo 1992) (lawyers in private practice may not use deception to investigate disciplinary violations rather than reporting conduct to authorities).

The Oregon Consumer League, Fair Housing Counsel of Oregon, Oregon Law Center, and numerous individual lawyers, also appearing as *amici curiae*, object to suggestions that only government lawyers should be exempt from certain

rules of professional conduct. They contend that there is no principled reason to permit government lawyers to engage in covert operations, but to label the same practices by the private bar as "unacceptable vigilantism" even if it, too, is for the purpose of rooting out fraud and illegality. Accordingly, those *amici* propose the following rule:

> "Provided that the conduct does not violate any other provision of law or Disciplinary Rule, and notwithstanding DR 1-102, DR 7-102 and ORS [9.527(4)], a lawyer, personally or through an employee or agent, may misstate or fail to state his or her identity and/or purpose in contacting someone who is the subject of an investigation for the purpose of gathering facts before filing suit."

The Bar contends that whether there is or ought to be a prosecutorial or some other exception to the disciplinary rules is not an issue in this case. Technically, the Bar is correct. However, the issue lies at the heart of this case, and to ignore it here would be to leave unresolved a matter that is vexing to the Bar, government lawyers, and lawyers in the private practice of law. A clear answer from this court regarding exceptions to the disciplinary rules is in order.

■    As members of the Bar ourselves—some of whom have prior experience as government lawyers and some of whom have prior experience in private practice—this court is aware that there are circumstances in which misrepresentations, often in the form of false statements of fact by those who investigate violations of the law, are useful means for uncovering unlawful and unfair practices, and that lawyers in both the public and private sectors have relied on such tactics. However, ORS 9.490(1) provides that the rules of professional conduct "shall be binding upon *all* members of the bar." (Emphasis added.) Faithful adherence to the wording of DR 1-102(A)(3), DR 7-102(A)(5), ORS 9.527(4), and this court's case law does not permit recognition of an exception for *any* lawyer to engage in dishonesty, fraud, deceit, misrepresentation, or false statements. In our view, this court should not create an exception to the rules by judicial decree. Instead, any exception must await the full debate that is contemplated by the process for adopting and amending the Code of Professional Responsibility. *See* ORS 9.490(1)

(describing process for formulating rules of professional conduct). Furthermore, this court is prohibited from inserting into ORS 9.527(4) an exception that the statute does not contain. ORS 174.010. That statute applies to a member of the bar "whenever * * * [t]he member is guilty of willful deceit or misconduct in the legal profession[.]" We decline to adopt an exception to DR 1-102(A)(3) and DR 7-102(A)(5), and we are without authority to read into ORS 9.527(4) an exception that the statute does not contain. Those disciplinary rules and the statute apply to all members of the Bar, without exception.

## V.  ACCUSED'S CONSTITUTIONAL DEFENSE

We turn to the accused's final theory of defense, which is that the Bar's decision to prosecute him in this case violated his rights under the state and federal constitutions. As we have explained, the accused believes that the Bar does not prosecute government lawyers who participate in investigations that involve deception, but it does prosecute lawyers in private practice who engage in similar conduct. According to the accused, the Bar thereby has "created two classes of attorneys" in violation of Article I, section 20, of the Oregon Constitution,[4] and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[5]

In the accused's view, the Bar's decision to dismiss his 1992 complaint against SAIF and DOJ lawyers, who allegedly had participated in Operation Clean Sweep, demonstrates the constitutionally impermissible classification system that the Bar has created. The trial panel rejected that argument. It reasoned:

"To the extent that SAIF's lawyers were not prosecuted, they were not prosecuted because of a lack of evidence, and

---

[1] Article I, section 20, provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

[5] The Fourteenth Amendment provides, in part:

"No State shall make or enforce any law which shall * * * deny to any person within its jurisdiction the equal protection of the laws."

not because of any prosecutorial immunity, notwithstanding the fact that the parties have raised the immunity issue in these proceedings."

The Bar does not respond specifically to the accused's argument, stating only that "the SPRB dismissed the [accused's 1992 complaint against SAIF and DOJ lawyers] based on lack of evidence."

The accused is correct that discriminatory application of a generally applicable law might violate Article I, section 20, or the Equal Protection Clause of the Fourteenth Amendment. *See State v. Clark*, 291 Or 231, 239, 630 P2d 810 (1981) (Article I, section 20, "reaches forbidden inequality in the administration of laws"); *United States v. Armstrong*, 517 US 456, 465, 116 S Ct 1480, 134 L Ed 2d 687 (1996) (selective prosecution claim cognizable under Fourteenth Amendment equal protection principles); *Village of Willowbrook v. Olech*, ____ US ____ , 120 S Ct 1073, 1074, 145 L Ed 2d 1060 (2000) ("class of one" can support equal protection claim if plaintiff alleges treatment different from others and no rational basis for difference in treatment). To prevail on such a claim, however, the accused must show that the Bar's decision not to prosecute SAIF and DOJ lawyers was based on an unconstitutional favoritism for those persons. *See Hunter v. State of Oregon*, 306 Or 529, 533, 761 P2d 502 (1988) (Article I, section 20, prohibits, among other things, prosecution based on "impermissible factors such as race or personal animosity or the absence of any standards that could ensure consistency"); *Oyler v. Boles*, 368 US 448, 456, 82 S Ct 501, 7 L Ed 2d 446 (1962) (identifying impermissible classifications such as "race, religion, or other arbitrary classifications" for purposes of equal protection analysis). Even assuming that it is impermissible under either constitution for the Bar to distinguish between government lawyers and lawyers in private practice in choosing whether to prosecute alleged violations of the Code of Professional Responsibility, the accused has failed to make the requisite showing in this case that the Bar follows that practice. The accused has shown only that the Bar believed that it did not have evidence to press charges against certain government lawyers in response to his complaint in 1992. The accused has not demonstrated that the Bar has a policy of prosecuting lawyers in private practice

but not prosecuting government lawyers who are accused of violating the Code of Professional Responsibility. On the facts of this case, we reject the accused's claim that the Bar violated Article I, section 20, or the Equal Protection Clause, in bringing this proceeding.

Having rejected the proposal that this court adopt an investigatory exception to DR 1-102(A)(3), DR 7-102(A)(5), and ORS 9.527(4), and concluded that the accused's constitutional defense is unavailing, we hold that the accused violated DR 1-102(A)(3), DR 7-102(A)(5), and ORS 9.527(4). We turn to the matter of sanction.

## VI.  SANCTION

The Bar contends that the accused should be suspended from the practice of law for at least 120 days. The accused replies that no sanction or, at most, a public reprimand is appropriate under the circumstances.

This court looks to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) for guidance in determining the appropriate sanction for violations of the disciplinary rules. *See In re Schaffner*, 323 Or 472, 478, 918 P2d 803 (1996) (so stating). ABA Standard 1.1 provides:

> "The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession."

Accordingly, the purpose of lawyer discipline is not to punish the lawyer. *See In re Huffman*, 328 Or 567, 587, 983 P2d 534 (1999) (so stating).

To determine the appropriate sanction, this court first considers the duty violated, the accused's mental state, and the actual or potential injury caused by the accused's misconduct. *In re Devers*, 328 Or 230, 241, 974 P2d 191 (1999). Considering those three factors leads to a suggested sanction, which this court may choose to impose or may modify after examining aggravating and mitigating circumstances and this court's case law. *Id.*

## A. *Duty Violated*

A lawyer owes the public a duty of honesty and personal integrity. *In re Unrein*, 323 Or 285, 288, 917 P2d 1022 (1996). By misrepresenting his identity and purpose and making other false statements when he called Becker and Adams with the intention of deceiving them, the accused violated his duty to the public to maintain personal integrity. The introduction to ABA Standard 5.0 explains that "[t]he public expects the lawyer to be honest[.]" The commentary to ABA Standard 5.13 further explains that, if the lawyer's conduct "is directly related to his or her professional role, discipline is required" even if the conduct at issue is not criminal.

## B. *Mental State*

The ABA Standards identify three levels of mental state: intentional, knowing, and negligent. ABA Standards at 6. An intentional act is one done with "the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. The accused concedes, and the record supports the finding, that he acted intentionally when he misrepresented his identity to Becker and Adams, and that he made false statements to them for the purpose of obtaining damaging admissions about CMR's file-review practices. Nonetheless, the accused argues, this court should view his mental state as negligent because, based on the letters from the Bar's disciplinary counsel to him, he believed that he was acting ethically when he made the misrepresentations and false statements. As we have explained previously, the accused's reliance on the Bar's letters was not reasonable. We conclude that the accused acted intentionally.

## C. *Injury*

A lawyer's conduct may cause actual or potential injury to a client, the legal system, the legal profession, or the public. ABA Standards at 6-7. In this case, there is no evidence, and the Bar does not contend, that the accused's conduct caused actual injury to Becker or Adams, because neither of them revealed any damaging information to the accused. However, the Bar contends that the accused's conduct created the possibility of injury to CMR. If Householder had not known the accused, and that he was a lawyer, Adams

might have given the accused confidential information about CMR's file-review practices that he would not have divulged if he had known the accused's true identity and purpose.

The accused contends that there was no potential for injury to CMR, because he eventually obtained the information that he sought through discovery. That argument is without merit. When the accused engaged in the conduct at issue in this case, he did so with the intent that CMR personnel would make damaging statements about their file review practices. The potential for injury that existed at that time was that Becker or Adams would make statements that could affect their legal rights regardless of any later lawful disclosure through discovery.

ABA Standard 5.13 provides:

> "Reprimand is generally appropriate when a lawyer *knowingly* engages in any [other than criminal] conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law."

(Emphasis added.) By contrast, ABA Standard 5.11(b) provides that disbarment is generally appropriate when:

> "a lawyer engages in any other [than criminal] *intentional* conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

(Emphasis added.)

D.   *Aggravating and Mitigating Factors*

Aggravating factors in this case include multiple violations of the rules during the accused's telephone calls to CMR personnel, ABA Standard 9.22(d), and the accused's substantial experience in the practice of law, ABA Standard 9.22(i).

The Bar contends that another aggravating factor is that the accused engaged in deception during the disciplinary process by withholding evidence. *See* ABA Standard 9.22(f) ("submission of false evidence, false statements, or other deceptive practices during the disciplinary process"). Specifically, it argues, the accused failed to disclose until well into

the investigation of Adams' complaint that he had made tape recordings of his conversations with Becker and Adams. He also stated in his January 9, 1996, letter that he was unable to locate the transcript of his telephone conversation with Adams, but admitted at the hearing that he had a copy of the transcript when that letter was sent.

The accused offers four explanations for his responses to the Bar's inquiries and investigation. First, he did not take Adams' complaint seriously for several months, because he believed that he was entitled to conduct a "private sting" against CMR. Second, the accused was "religiously [*sic*] indignant" that the Bar did not dismiss Adams' complaint, because his sole purpose in contacting Becker and Adams was to "root out fraud." Accordingly, his responses to the Bar's inquiries during the initial period of its investigation were, in his words, "nasty" and "arrogant," which he regrets. Third, the accused admitted to all the conduct alleged in the Bar's complaint, and he did not believe that matters such as the transcript of his conversation with Adams were relevant in light of those admissions. Finally, the accused was involved in litigation with State Farm and CMR during the same time that the Bar proceedings were under way, and he feared releasing any documents or information that would compromise that litigation.

Our review of the record reveals that the accused was not always as candid as he should have been during the Bar's investigation. Regardless of a lawyer's feelings about the merits of a complaint, he or she must be honest and cooperative with the Bar. *In re Wyllie*, 327 Or 175, 182, 957 P2d 1222 (1998). However, the Bar did not charge the accused with violating DR 1-103(C) (duty to cooperate with disciplinary investigation). Our review of the record also persuades us that there was a degree of misunderstanding on both sides that hampered communications during the Bar's investigation and that extended into the trial panel proceedings. Accordingly, to the extent that the accused's lack of candor in this case is an aggravating factor, we do not accord it substantial weight.

The Bar suggests that another aggravating factor is that the accused has a record of prior discipline, consisting of

a letter of admonition in 1989. ABA Standard 9.22(a). That admonition dealt with a complaint alleging that the accused had over-billed a client for costs and charged an excessive fee. We do not consider that admonition as an aggravating factor here, because it did not involve the same or similar misconduct that is at issue in this case. *See In re Cohen*, 330 Or 489, 8 P3d 953 (2000).

We turn to mitigating factors. The accused did not act with a selfish motive. ABA Standard 9.32(b). The accused sincerely believed, and still believes, that lawyers must be permitted to make misrepresentations and false statements of identity and purpose to discover information without violating the disciplinary rules. In addition, two witnesses testified that the accused has a good character and reputation. ABA Standard 9.32(g).

E.    *Oregon Case Law*

This court has stated that any violation of DR 1-102(A)(3) is a "serious matter," *Greene*, 290 Or at 297, and it views the making a false statement of fact in violation of DR 7-102(A)(5) as an act of moral turpitude, *Chambers*, 292 Or at 681. In other situations, violations of those rules have resulted in significant suspensions from the practice of law. However, this proceeding has brought to the surface an issue that has been festering for some time, namely, whether *any* lawyer may misrepresent his or her identity or purpose to gather information without violating the Code of Professional Responsibility. Statements by parties *amici* indicate that lawyers in both private practice and those who work in the public sector in good faith have held the mistaken belief that they ethically are permitted to misrepresent their identity and purpose, and to encourage others to do so, to acquire information. Thus, it is a fortuity that the accused in this case, rather than some other Oregon lawyer, is the subject of these proceedings.

As we have explained, the accused was mistaken in his belief that a lawyer is entitled to misrepresent identity and purpose to gather information without violating the Code of Professional Responsibility and ORS 9.527(4). Nonetheless, the briefing in this case reveals that the accused is not alone among lawyers in holding that belief. The Bar's

June 16, 1993, letter to the accused in response to his complaint about SAIF and DOJ lawyers indicates that the Bar also may believe there might be exceptions to the rules and statute. However, as we have explained, the wording of DR 1-102(A)(3), DR 7-102(A)(5), and ORS 9.527(4), as well as this court's case law, do not permit recognition of an exception to those rules and statute. The rules and statute apply to all members of the Oregon State Bar, without exception.

In this case, the accused admitted fully and freely in his answer to the Bar's complaint that he had engaged in the conduct the Bar alleged. He again admitted to that conduct during the trial panel proceedings. His candor with the Bar during its investigation was not exemplary but, as noted, the Bar did not charge him with violating DR 1-103(C). Under the circumstances of this case, therefore, we conclude that a public reprimand is the appropriate sanction.

The accused is reprimanded.