Argued and submitted November 2, 2001, accused suspended from the practice of
law for one year January 10, 2002

In re Complaint as to the Conduct of

DAVID N. LACKEY,
*Accused.*

(OSB 98-33; SC S48552)

37 P3d 172

David N. Lackey, Salem, argued the cause and filed the briefs *in propria persona*.

Martha M. Hicks, Assistant Disciplinary Counsel, Lake Oswego, argued the cause for the Oregon State Bar. With her on the brief was Wilson C. Muhlheim, Eugene.

Before Gillette, Presiding Justice, and Durham, Leeson, Riggs, De Muniz, and Balmer, Justices.*

PER CURIAM

* Carson, C. J., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer discipline proceeding, the Oregon State Bar (Bar) charged the accused with twice revealing client confidences and secrets in violation of Code of Professional Responsibility Disciplinary Rule (DR) 4-101(B) and ORS 9.460(3) (each set out below).[1] The accused defended, in part, on the theory that his disclosures revealed allegedly corrupt government practices and, therefore, were exempt from the prohibitions in DR 4-101(B) on public policy grounds. He further contended that one of the disclosures had involved information that was neither a client secret nor a confidence. The trial panel rejected those arguments, concluded that the accused had committed the violations, and suspended him from the practice of law for 18 months.

Our review of the decision of the trial panel is automatic, ORS 9.536(2); Bar Rule of Procedure (BR) 10.1 (each providing for automatic review of lawyer suspensions exceeding six months), and *de novo*, ORS 9.536(3); BR 10.6. The Bar has the burden of establishing the alleged misconduct by clear and convincing evidence. BR 5.2. For the reasons that follow, we agree with the trial panel that the accused violated DR 4-101(B)(1) through (3) and ORS 9.460(3) on one occasion, but conclude that the Bar has not met its burden of proving by clear and convincing evidence that the accused disclosed information that constituted client confidences or secrets on a second occasion. Accordingly, we dismiss that charge. As noted, the trial panel ordered that the accused be suspended for 18 months. Because we dismiss the Bar's charges related to one cause of complaint, and for the reasons discussed below, we suspend the accused for one year.

## I.  FACTS

We find the following facts by clear and convincing evidence. From April 1984 until January 1994, the accused was employed as the full-time Judge Advocate for the Oregon National Guard (ONG). His duties included providing legal

---

[1] The Bar also charged the accused with three other causes of complaint. A trial panel of the Disciplinary Board dismissed two of those causes of complaint at the request of the Bar and concluded that the Bar had failed to prove the other complaint. The Bar has not challenged that conclusion.

support to the Adjutant General and his staff, the Oregon Army and Air National Guard of the State, and the United States Property and Fiscal Officer (USPFO) for the State of Oregon. On January 31, 1994, the accused resigned from active duty as Judge Advocate, and, on two occasions shortly thereafter, he made disclosures to the press regarding legal matters pertaining to the ONG (hereinafter referred to as "the audit matter" and "the Brown discharge matter"). Before turning to a discussion of those disclosures, we address first the circumstances leading to the accused's resignation.

## A.  Circumstances Leading to Accused's Resignation

Beginning in late 1991, the accused developed a contentious relationship with the newly appointed State Judge Advocate at the ONG, Colonel Noteboom. Noteboom was a member of the ONG reserves, whose regular duty consisted of one weekend of service each month and a 15-day period of training each year. As the full-time Judge Advocate, the accused's job was to function as Noteboom's day-to-day representative at the ONG. The accused, however, refused to acknowledge Noteboom's authority as his supervisor. Specifically, the accused believed that Noteboom had been appointed unlawfully and that, as a reservist, Noteboom was not authorized to give legal advice when he was not on active duty. Eventually, the ONG Chief of Staff intervened to direct the accused to accept Noteboom as a superior officer.

Over the next two years, the conflict between the accused and Noteboom escalated. The accused continued to believe that Noteboom was appointed unlawfully and also filed formal complaints with his superior officers, accusing Noteboom of negligence and incompetence. When Noteboom counseled the accused regarding the accused's performance and placed him on a work improvement plan, the accused filed additional complaints with the Air National Guard Commander and the State Inspector General, accusing both Noteboom and the ONG Chief of Staff of retaliating against his "whistle-blowing" activities. The Adjutant General of the ONG, Major General Katke, found those complaints to be without merit and, in February 1993, issued a letter of reprimand to the accused.

The accused subsequently filed complaints against Noteboom with the Oregon State Bar, the Bureau of Labor and Industries (BOLI), and the Oregon Attorney General. The thrust of those complaints, as with his prior complaints, was that the ONG improperly had appointed Noteboom as the State Judge Advocate and, therefore, that Noteboom was usurping the duties and responsibilities of the accused. The accused also maintained that all negative personnel actions that the ONG had taken against him, including Major General Katke's letter of reprimand, were in retaliation for his "blowing the whistle" on Noteboom's unlawful appointment.

As a result of the accused's complaints against him, Noteboom requested that the ONG remove him from the accused's chain of command, pending a formal military investigation into the various charges. The ONG granted that request and, in May 1993, appointed an independent military investigator, Colonel Mansfield, to conduct a comprehensive investigation of the accused's allegations. In his final report, Mansfield concluded that, although it was true that Noteboom's appointment was technically deficient,[2] the accused's persistent questioning of Noteboom's judgment, authority, and competence was not justified. Moreover, Mansfield concluded that the accused's allegations that adverse personnel actions taken against him were in retaliation for his "whistle blowing" were groundless. Mansfield recommended that the ONG terminate the accused as the fulltime Judge Advocate.

In October 1993, the ONG and the accused reached an agreement whereby the accused would resign his full-time position and dismiss all pending actions against the ONG in exchange for being permitted to keep his military position in the reserves until he was eligible for retirement. However, one week before resigning, the accused filed a final "whistle blower" complaint with the Pentagon's Defense Fraud, Waste, and Abuse Hotline, insisting that the personnel

---

[2] ORS 398.012(1) provides that "the Governor, on the recommendation of the Adjutant General, shall appoint" the State Judge Advocate. Mansfield's investigation revealed that, historically, all the State Judge Advocates, including Noteboom, had been appointed by the Adjutant General purporting to act "by order of the Governor."

actions that the ONG had taken against him were in retaliation for his prior complaints about Noteboom's appointment and performance. There is no evidence in the record that the Pentagon responded to that complaint.

## B. *The Audit Matter*

In 1992, an internal audit of the ONG revealed that many senior employees erroneously had received overpayments during the previous year relating to calculation of leave and training duty pay, totaling over $38,000. At the request of the Adjutant General of the ONG, the accused reviewed the audit results and submitted a memorandum that rendered legal advice and made recommendations to the ONG staff. In that memorandum, the accused noted that there were indications of gross negligence or fraud on the part of some ONG employees. He recommended that the USPFO conduct quarterly inspections of payment practices for the next two years, initiate action to recoup overpayments, conduct payroll audits of other years, and screen certain cases of overpayment for potential disciplinary action. The USPFO supervising auditor submitted a memorandum to the Adjutant General that also recommended recoupment of overpayments from future wages, but suggested only limited informal investigations and no further audits. The Adjutant General ultimately approved the auditor's recommendations and not those of the accused.

In March 1994, after the accused had resigned as Judge Advocate for the ONG, he telephoned and wrote a letter to Santos, legal counsel to the Governor of Oregon. In those communications, the accused once again renewed his complaints of retaliatory treatment at the hands of Noteboom and others. However, the accused, for the first time, also suggested that the retaliatory acts were in response to his 1992 audit memorandum. According to the accused, his superiors "may have" viewed that memorandum as an act of insubordination, because it exposed senior ONG staff officers as "being involved in pay irregularities or in mismanaging pay." Santos responded that the Inspector General's Office had taken the accused's allegations under advisement. One week later, however, the accused disclosed his letter to Santos, along with the 1992 audit memorandum,

to local television and newspaper reporters. At that time, the accused did not have permission from the ONG to make those disclosures to the press.

## C. *The Brown Discharge Matter*

In 1992, an ONG nurse, Lieutenant Colonel Brown, was caught stealing prescription drugs from the Oregon Military Academy. The accused reviewed the report of the Brown investigation and advised the Adjutant General to refer the matter to the Clatsop County District Attorney. In subsequent discussions with the district attorney on behalf of the ONG, the accused proposed, with the approval of the Adjutant General, that any plea agreement include a promise by Brown to accept a less than honorable discharge from the ONG. The accused also disclosed his conversations with the district attorney's office to others within the ONG, including nurses who worked with Brown. Those disclosures were authorized. The district attorney allowed Brown to enter a diversion program, and, after she successfully completed the program, the district attorney dismissed the charges against her.

In April 1994, a newspaper reporter contacted the accused and told him that Brown had received an honorable discharge from the ONG and had been appointed as a Lieutenant Colonel in the Army Reserve. The reporter also informed the accused that the district attorney's office had said that it would not have agreed to the plea bargain if it had known that Brown would receive an honorable discharge. The accused stated to the reporter that Brown's honorable discharge was inconsistent with his recommendations to the Adjutant General and with the terms and conditions of the plea bargain that the accused had discussed with the district attorney. The accused did not have permission from his client to make those disclosures.

## II.  ALLEGED VIOLATIONS

### A. *The Audit Matter*

We first address the Bar's allegation that, by revealing the contents of his 1992 audit memorandum to the press,

the accused disclosed client confidences and secrets in violation of DR 4-101(B)(1) through (3) and ORS 9.460(3). DR 4-101 provides, in part:

"(A)  'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in a current or former professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

"(B)  Except when permitted under DR 4-101(C), a lawyer shall not knowingly:

"(1)  Reveal a confidence or secret of the lawyer's client.

"(2)  Use a client confidence or secret of the lawyer's client to the disadvantage of the client.

"(3)  Use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure."

ORS 9.460(3) provides that an attorney shall "[m]aintain the confidences and secrets of the attorney's clients consistent with the rules of professional conduct established pursuant to ORS 9.490."

At the trial panel hearing, the accused conceded that he had considered the advice and recommendations that he had given to his clients regarding the 1992 audit to be confidential. Thus, the trial panel concluded that, when the accused released his 1992 audit memorandum to the press, the accused improperly had disclosed client confidences and secrets in violation of DR 4-101(B)(1) and ORS 9.460(3). The panel further concluded that the accused had violated DR 4-101(B)(2) and (3) because those disclosures had been intended to satisfy the accused's desire to embarrass and injure officers of the ONG with whom he had prior work-related conflicts.

On review, the accused does not dispute that the audit recommendations contained in his 1992 memorandum were confidential attorney-client communications. Rather, he contends that the failure of the ONG to follow the recommendations in his 1992 audit memorandum was evidence of an ongoing conspiracy at the highest levels of the ONG to

suppress the audit results and defraud the public. The accused further maintains that he had attempted to resolve the situation internally, but had been thwarted by his superiors. He urges this court to recognize an exception to DR 4-101 and ORS 9.460(3) that would permit lawyers employed by government agencies, such as himself, to "blow the whistle" on fraud and corruption when necessary to satisfy a fiduciary duty to the public.[3]

In support of such an exception, the accused relies on a 1973 Federal Bar Association Ethics Opinion that states that a lawyer for a public agency "assumes a public trust," which allows the lawyer, under certain circumstances, to disclose to the public confidences and secrets subject to the lawyer-client privilege.[4] Federal Bar Ass'n Professional Ethics Comm., Op 73-1 (1973) (*The Government Client and Confidentiality*, reprinted in 32 Fed BJ 71 (1973)). According to that opinion, disclosure is permitted:

> "when the lawyer, as a reasonable and prudent [person], conscious of [the] professional obligation of care, confidentiality and responsibility, concludes that [government] authorities have without good cause failed in the performance of their own obligation to take remedial measures required in the public interest."

*Id.* at 75.

---

[3] At the trial panel hearing, the accused presented the additional argument that the Oregon "whistle blower" statute, ORS 659.505 *et seq.*, protected his disclosures relating to the 1992 audit. The trial panel disagreed, interpreting that statute to prohibit the release of information subject to the attorney-client privilege. The accused has abandoned that argument on review.

[4] We note that the Model Rules of Professional Conduct do not incorporate the exception that the Federal Bar Association's 1973 ethics opinion sets out. Rule 1.13(c) provides:

"If, despite the lawyer's efforts * * *, the highest authority that can act on behalf of an organization insists upon action, or a refusal to act, that is clearly a violation of law and is likely to result in substantial injury to the organization, the lawyer may resign * * *."

In adopting Model Rule 1.13(c), the ABA House of Delegates rejected a proposed exception that would have allowed a lawyer for an organization to make limited disclosures outside entity walls when confronted with entrenched corruption at the highest echelons of the governing body. Geoffrey C. Hazard, Jr., 1 *The Law of Lawyering* § 17-12, at 17-41 (3d ed 2001).

DR 4-101(B) and ORS 9.460(3) contain no exception for lawyers employed by a government agency. Under similar circumstances, this court declined to create an exception to the Disciplinary Rules by interpretation. *See In re Gatti*, 330 Or 517, 8 P3d 966 (2000) (declining to create exception to DR 1-102(A)(3), DR 7-102(A)(5), and ORS 9.527(4)). We need not decide the issue here, however, because the accused has failed to establish a factual case for creating such an exception. The record discloses no facts to support the accused's claim that his attempts to remedy government fraud in connection with the 1992 audit were "thwarted" by his superiors, thus justifying a public disclosure of client confidences and secrets. There is no evidence in the record that the accused disclosed to anyone outside the ONG that the failure of the ONG to follow the recommendations in his audit memorandum was evidence of fraud until after his forced resignation in 1994.[5] Of the many complaints that the accused filed with his superiors and with government agencies from 1992 until 1994, none alleged any fraud or cover-up in connection with the ONG's response to the 1992 audit. Rather, the record discloses that all the accused's complaints remained grounded in his persistent belief that the ONG had appointed Noteboom unlawfully and that the accused was the subject of retaliation for "blowing the whistle" on that unlawful appointment. It was only after his forced resignation as Judge Advocate that the accused first voiced concern about whether the ONG had followed the recommendations in his 1992 audit. The timing of the accused's disclosure, together with the lack of evidence supporting his allegations of a conspiracy to defraud the public, leads us to conclude that the accused revealed sensitive confidential communications relating to the 1992 audit out of a desire to embarrass or injure the officers of the ONG. The accused has failed to present evidence to support his claim that his superiors thwarted

---

[5] The accused claims that, by late spring 1993, he had reason to believe that the ONG administrators were engaged in a conspiracy to thwart the disclosure of the 1992 audit results to the appropriate authorities. He claims that he disclosed the results of the audit to his liaisons at the National Guard Bureau and the Oregon Department of Justice (DOJ) who, assertedly, took no action. However, we could find no evidence of those disclosures in the record. For example, in a 1993 letter to officials at DOJ, the accused did not mention fraud in connection with the 1992 audit.

his efforts to remedy government fraud in connection with the 1992 audit and, therefore, has not even established the predicate for his proposed exception to the Disciplinary Rules.

Having rejected the accused's proposed exception, we reiterate that the accused does not dispute that his audit memorandum contained client confidences and secrets. We agree with the trial panel that revealing that memorandum to the press resulted in unauthorized disclosures of client confidences and secrets, and that those disclosures were intended to satisfy the accused's desire to embarrass or injure officers of the ONG with whom he had prior work-related conflicts. Accordingly, we find that the accused violated DR 4-101(B)(1) through (3) and ORS 9.460(3).

## B. *The Brown Discharge Matter*

We turn next to the Bar's allegation that, by disclosing to the press his recommendation to the Adjutant General that Brown receive an other than honorable discharge, the accused revealed client confidences and secrets in violation of DR 4-101(B)(1) through (3) and ORS 9.460(3). The trial panel found that the accused had disclosed to the district attorney his recommendation regarding Brown's discharge, as well as the Adjutant General's agreement with that recommendation, and that those disclosures were authorized. However, the trial panel also found that the accused was not authorized to reveal publicly the failure of his superiors to discharge Brown in accordance with the representations made to the district attorney's office. The trial panel concluded that the accused's recommendations to the ONG concerning the Brown discharge were confidences or secrets, and that his disclosure of them to the press violated the Disciplinary Rules.

The accused argues that his recommendations to his superiors and the ONG's agreement to give Brown an other than honorable discharge were not client confidences or secrets because they previously had been disclosed to a third party, namely, the Clatsop County District Attorney. The accused cites this court's decision in *Baum v. Denn,* 187 Or 401, 406-07, 211 P2d 478 (1949), for the proposition that a

"client cannot authorize his lawyer to speak for him in dealing with third persons, and then undertake to seal his lips as to what transpired."

The record evidence is murky, at best, regarding what the accused told the district attorney about the accused's recommendations to the Adjutant General, what the Adjutant General authorized the accused to communicate to the district attorney, and what the district attorney might have communicated to the trial court in connection with the Brown plea bargain. The Adjutant General did not testify at the hearing. No one from the district attorney's office testified. No transcript from any court appearance by Brown or any court records regarding her prosecution were introduced. The accused's testimony about the sequence and specific content of his conversations with the Adjutant General and with the district attorney's office is ambiguous regarding the extent to which he was authorized to and did, in fact, disclose to the district attorney his recommendation to his superiors regarding the discharge.

■ As noted, the trial panel made the factual findings that the accused had disclosed to the district attorney's office his recommendations to his superiors and that the disclosure was authorized. The trial panel, nevertheless, concluded that the accused's later disclosure to the press of his recommendations was a disclosure of client confidences or secrets. We disagree.

The disciplinary rules forbid the disclosure of client "confidences" or "secrets" without client authorization. DR 4-101(A) defines a "confidence" as "information protected by the attorney-client privilege under applicable law * * *." When the holder of the privilege discloses, or consents to the disclosure of, information subject to the privilege to a third person, then the information is no longer privileged. OEC 511. Here, the trial panel found that the accused had disclosed his recommendations to his superiors to the district attorney and that the disclosure was authorized. If so, then the recommendations were no longer "confidences." We find the record to be less clear on that issue than the trial panel did, but our review leads us to conclude that the Bar has failed to prove by clear and convincing evidence that the

accused's recommendations to his superiors were "confidences" under DR 4-101(A), the disclosure of which violated DR 4-101(B)(1) through (3) and ORS 9.460(3).

■ We next consider whether the information the accused disclosed to the press regarding Brown constituted client "secrets," the disclosure of which was barred by the disciplinary rules. As noted, DR 4-101(A) defines a client "secret" as "other information gained in a current or former professional relationship that the client has requested be held inviolate *or* the disclosure of which would be embarrassing or would likely be detrimental to the client." (Emphasis added.) It is undisputed that the accused gained information about the Brown discharge while acting as a lawyer for the ONG; even if the information was no longer privileged because of its prior, authorized disclosure to the district attorney, it still could be a "secret" if the client had requested that it be held inviolate or if the disclosure would be embarrassing or likely be detrimental to the client. Based on our review of the record, we find that the Bar has not proved by clear and convincing evidence that the ONG had requested that the accused hold inviolate the information regarding the Brown discharge that the accused previously had provided to the district attorney. The information, therefore, was not a "secret" under the first prong of the definition contained in DR 4-101(A).

We also conclude that the Bar has not proved by clear and convincing evidence that the accused "revealed" information that "would be embarrassing or would be likely to be detrimental to the client." DR 4-101(A). It is true that it might have been embarrassing or detrimental to the ONG for the press to report that the ONG had informed the district attorney that Brown would receive a less than honorable discharge and that Brown, in fact, received an honorable discharge. However, on this record, it appears that the information—and any embarrassment or detrimental effect to the ONG—was public information and was provided to the press by others before the press contacted the accused.

Any embarrassment or detriment would have resulted from the disclosure of two facts: first, that the ONG had informed the district attorney that it planned to give

Brown a less than honorable discharge if she pleaded guilty; and, second, that the ONG later gave Brown an honorable discharge. As discussed above, the fact that the ONG had determined that Brown should receive a less than honorable discharge properly was disclosed by the accused to the district attorney and to others within the ONG. Under those circumstances, the district attorney would have been entitled to make the ONG's position known in open court at the time of the Brown plea bargain. The record also shows that the fact that Brown had received an honorable discharge was publicly available information and, in any event, was disclosed by a reporter to the accused, rather than by the accused to a reporter. Any embarrassment or detriment to the ONG was the result of the initial communication to the press of the ONG's own failure, for whatever reason, to give Brown an other than honorable discharge when it previously had represented to the district attorney that it would do so. The record does not show how the press initially obtained information regarding the Brown discharge matter, and the accused denies that he initiated any contact with the press. The Bar has not proved by clear and convincing evidence that the accused revealed information to the press that was embarrassing or would be likely to be detrimental. Accordingly, we hold that the accused did not violate DR 4-101(B)(1) through (3) or ORS 9.460(3) in connection with the Brown discharge matter.

## III. SANCTION

■ Having determined that the Bar has proved by clear and convincing evidence that the accused disclosed client confidences and secrets on one occasion in violation of DR 4-101(1) through (3) and ORS 9.460(3), we turn to the question of the appropriate sanction. The trial panel imposed an 18-month suspension based on its finding that the accused's conduct on two occasions was prejudicial to his clients, who were subjected to unwanted adverse publicity.

■■ This court refers to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) for guidance in determining the appropriate sanction for lawyer misconduct. *See In re Schaffner*, 323 Or 472, 478, 918 P2d 803 (1996) (so stating).

To determine the appropriate sanction, "this court first considers the duty violated, the accused's mental state, and the actual or potential injury caused by the accused's misconduct. Considering those three factors leads to a suggested sanction, which this court may choose to impose or may modify after examining aggravating and mitigating circumstances and this court's case law." *In re Gatti*, 330 Or at 535 (citations omitted).

The ABA Standards state that "the most important ethical duties are those obligations which a lawyer owes to *clients*." ABA Standards at 5 (emphasis in original). Included in those obligations is the duty of loyalty, which encompasses the duty to maintain client confidences. ABA Standard 4.2. In this instance, the accused violated his duty of loyalty by disclosing client confidences and secrets. The accused acted with "intent," because he made those disclosures with a "conscious objective or purpose to accomplish a particular result." ABA Standards at 7.

The ABA Standards describe disbarment as the "generally appropriate" sanction when a lawyer knowingly discloses client confidences "with the intent to benefit the lawyer or another" and the disclosure causes injury or potential injury to the client. ABA Standard 4.21. Suspension is generally appropriate for such a disclosure "when the lawyer is not intentionally using the professional relationship to benefit himself or another * * *." Commentary to ABA Standard 4.22. With that guidance in mind, we consider the aggravating and mitigating factors and our case law.

Two factors that the ABA Standards identify as "aggravating" are present in this case. The accused's conduct was undertaken with a selfish motive, *i.e.*, to exact revenge on his superiors at the ONG, ABA Standard 9.22(b). Further, the accused has substantial experience in the practice of law, having been a member of the Bar for more than 20 years. ABA Standard 9.22(i). A mitigating circumstance is that the accused has no prior record of disciplinary offenses. ABA Standard 9.32(a).

We turn to this court's case law. In *In re Huffman*, 328 Or 567, 592, 983 P2d 534 (1999), this court imposed a

two-year suspension on a lawyer who disclosed client confidences and threatened the client with criminal charges in violation of DR 4-101(B)(1) through (3) and DR 7-105(A). As here, the lawyer in *Huffman* acted intentionally and was motivated by self-interest. However, this court noted that the lawyer's lack of a prior disciplinary record mitigated against disbarment. *Id.* at 591-92.

Here, the trial panel concluded that an 18-month suspension, rather than disbarment, was an appropriate sanction. As noted, that decision rested on the trial panel's finding against the accused on two causes of complaint, one of which we have dismissed. The trial panel's sanction was less than the two-year suspension imposed in *Huffman*. However, the accused lawyer in *Huffman* was charged with threatening criminal prosecution in addition to disclosing client confidences and secrets. Adjusting the trial panel's sanction based on our review of the accused's conduct, we conclude that a one-year suspension is an appropriate sanction in this proceeding.

The accused is suspended from the practice of law for a period of one year, commencing 60 days from the filing of this decision.